Argued and submitted September 6, 1983, reassigned June 1, reassigned October 25, 1984, reversed March 6, 1985

GENEST,
*Respondent on Review,*

*v.*

JOHN GLENN CORPORATION et al,
*Petitioners on Review.*

(113,798; CA A23098; SC 29599)

696 P2d 1058

J. Michael Alexander, Salem, argued the cause for petitioners on review. With him on the briefs were Charles D. Burt and Burt, Swanson, Lathen, Alexander & McCann, Salem.

Paul J. Lipscomb, Salem, argued the cause for respondent on review. With him on the briefs were Ron MacDonald and Blair, MacDonald, Jensen & Lipscomb, Salem.

LENT, J.

## LENT, J.

We are first required to ascertain the terms of an option to purchase real property and then to decide whether the holder of the option is entitled to a judgment for specific performance. Both the trial court and the Court of Appeals, *Genest v. John Glenn Corporation*, 62 Or App 562, 661 P2d 1383 (1983), found that plaintiff had established that the option fixed a purchase price of $425,000 with a limit of 29 percent thereof to be paid in the first year of exercise of the option, and a certain amount paid under the terms of a lease of the property to be credited against the purchase price. The trial court denied a judgment of specific performance, however, because the court believed the contract to be "too incomplete" in other essential respects to entitle plaintiff to specific performance. The Court of Appeals, on the other hand, relying on what it perceived to be the trend of the law pronounced by this court in recent years, determined that the plaintiff was entitled to specific performance and remanded the cause to the trial court to fashion a decree "not inconsistent with" the appellate court's opinion. Although we agree with both courts that the terms of the option were as above described, we agree with the trial court that plaintiff is not entitled to the specific remedy of specific performance in equity.

When we allowed defendants'[1] petition for review, we did not limit review to questions of law as we might have under ORS 19.125(4); therefore, we believe we are to try the cause "anew upon the record."[2] The facts we now state are those we find to be either undisputed or established by the evidence.

---

[1] Defendants are two corporations and two individuals. One corporation is successor to the corporation that owned the business herein involved, and the other corporation owned the real property on which the business had been conducted. The two individuals were the sole shareholders and officers of the corporations, and no question has been presented requiring us to distinguish among the defendants for the purposes of findings of fact or holdings of law.

[2] Historically, appeals in equity have been tried anew upon the record under the statutes of this state. After the creation of the Court of Appeals in 1969, that court was required by former ORS 19.125(3), upon appeal in equity, to try the cause anew upon the record, as was the duty of this court prior to the creation of the Court of Appeals. It was not clear whether this court upon discretionary review under ORS 2.520 had that same duty. In 1979 ORS 19.125 was amended to give this court the option of limiting review to questions of law in causes tried anew upon the record in the Court of Appeals, Or Laws 1979, ch 396, § 1.

In 1971 defendants, desiring to sell their restaurant business, known as the Keg & Platter, employed a business broker named Crain to effect a sale.[3] The listing agreement was for sale of the business, a ten-year lease of the real property on which the business was conducted and a right in the buyer of the business and lessee of the property of first refusal if the realty were sold.

Crain placed newspaper advertisements that first attracted the interest of the plaintiff in the summer of 1971, but nothing came of it at that time. Plaintiff expressed renewed interest in February of 1972, and serious negotiations began at that time. Plaintiff and the individual defendants did not meet or deal directly with each other during the entire period of negotiations. Defendant John Wilbur had the laboring oar for defendants and dealt with plaintiff only through Crain.

We shall describe the various offers and counter offers in some detail so as to demonstrate the close bargaining on terms that did occur.

After some negotiations between Crain and plaintiff, Crain prepared a form dated February 5, 1972, entitled "Earnest Money Receipt" and forwarded it to plaintiff. The Receipt provided for sale of the business for $275,000 plus the value of the inventory at the time of closing. The Receipt provided for $5,000 earnest money, and the payment of an additional $70,000 plus the value of inventory on closing. The balance was to be paid at $2,325 or more per month, including seven percent interest on the unpaid balance. No more than 29% of the purchase price was to be paid in the first year.[4] The purchaser was to be granted a ten-year lease payable at $3,500 per month, or seven percent of gross sales. The lease was to contain an option to purchase the real property, which could

---

[3] Defendants actually entered into a listing agreement with Crain's employer, an incorporated business broker, but Crain was the broker involved in this matter.

[4] Those terms seem somewhat self-contradictory. If, for example, the sale occurred and monthly payments began in May, 1972, eight monthly payments of $2,325 would be made. At seven percent interest, about $1,167 of each monthly payment would be allocated to interest and about $1,158 to principal. Eight monthly payments would produce about $9,264 in payments on principal. Adding that figure to the total down payment of $75,000 would produce a principal payment in 1972 of $84,264. That is well above 29% of $275,000, which equals $79,750.

be exercised at any time after the commencement of the fifth year of the leasehold period. No price for the realty was set forth. The lease was also to provide "tax escalation clause and building maintenance and insurance provision clauses." The terms of the Receipt were not acceptable to plaintiff.

Crain prepared another Earnest Money Receipt dated February 21, 1972. The terms of the proposed sale of the business were essentially the same, but the lease was to be payable at $3,500 per month or five percent of gross food sales plus seven percent of gross liquor sales, whichever would prove to be greater. The lease was to contain an option to purchase the realty, exercisable after the commencement of the fifth year for a price of $425,000, with ten percent of the lease payments "to be allowed as credit against purchase." The lease would be the same as to taxes, maintenance and insurance. Plaintiff rejected this proposal.

Crain and plaintiff then discussed the matter further. Plaintiff made it clear to Crain that the option to purchase the realty was very important to consummation of the sale of the business. Crain then prepared another Earnest Money Receipt, also dated February 21, 1972. This Receipt was essentially the same as to terms of sale of the business, the term of the lease and the rental payments, and the purchase price of the realty. The material changes were that 20% of the lease payments would be credited against the purchase price, and the language concerning a tax escalation clause, building maintenance and insurance was not included. Plaintiff signed this Receipt, as did Crain.

On February 29, 1972, Crain presented the Receipt to the Wilburs. They were unwilling to accept the terms. They informed Crain of changes they believed to be essential, and Crain prepared documents to supplement the Receipt. Under the terms of the supplement the plaintiff would be bound to assume certain leases for business signs and would be required to continue the sellers' existing insurance program for buildings, equipment and stock and for liability and business interruption. The supplement further provided:

"Purchaser is hereby granted the option to purchase the real property on the following terms and conditions: Purchase price to be $425,000 with credit of 10% of total lease payments during the life of the lease being allowed as a credit against the

purchase price. Option to purchase may not be exercised for a period of five years. Down payment and principal payment may not exceed 29% in year option is exercised."

On February 29, 1972, the Wilburs signed the Receipt and signed the supplement for the Keg & Platter Corporation.[5]

Crain then took the Receipt and supplement to plaintiff, who would not agree without further change. Crain prepared another supplement that, among other things, specified, "Credit on lease fees paid to be increased from 10% to 15%." That supplement was dated March 1, 1972, and was signed as "Approved" by the Wilburs and plaintiff. By their terms, the supplements were to be attached to and become a part of the Receipt.

The Wilburs undertook to have their lawyer prepare a lease and a contract of sale. John Wilbur, without any discussion of the matter with plaintiff or securing his prior approval, told the lawyer to change the option price to "not less than $425,000." That part of the lease was drawn to read as follows:

"(23) *Option to Purchase Real Property.* Lessee submits to Lessor its option to purchase the real property upon which the Keg & Platter is located and adjacent property which presently is owned by the Lessor. Said option proposed by Lessee shall be not less than $425,000.00 and said option may be exercised by Lessee at any time after five years from the date of this agreement, and while this lease is in force and effect. The terms of Lessee's option to purchase said real property provide in part, that no more than twenty-nine percent (29%) of the total purchase price shall be paid as a down payment during the year the option is exercised; also, under the terms of this lease, Lessee shall have as a credit for the purchase of said real property an amount of fifteen percent (15%) of the total lease payments made to the date of Lessee's purchase of the real property, to apply to the purchase price."[6]

---

[5] The Keg & Platter Corporation was then owner of the business. Defendant *Eastside Properties, Inc.,* is the successor to that corporation.

[6] Although, as will appear later in the body of the opinion, the defendants contend that this is the provision that governs the parties' respective rights, no one involved has made any particular point of the fact that the text purports to be the submission of an option *by the Lessee to the Lessor* to purchase the property already owned by the Lessor.

When Crain presented the lease to plaintiff, plaintiff drew Crain's attention to the words "not less than $425,000.00" and inquired as to the "significance" of that language. Crain told him that it was not significant "because the purchase price was specifically spelled out in the sales agreement and the exhibits attached thereto as $425,000."

The lease required the lessor to pay all real property taxes and special assessments against the realty.

The lease further contained the following paragraph:

"(22) *Lease Acceptance.* This agreement contains all the oral and written agreements, representations and arrangements between the parties hereto; and any rights which the respective parties hereto may have under any previous contracts or oral arrangements are hereby cancelled and terminated; and no representations or warranties are made or implied other than as set forth herein; and no oral agreement or representations for rental shall be deemed to constitute a lease other than this agreement. This lease may not be amended hereto except by written instrument signed by each of the parties."

By its terms the lease was "made this 23rd day of March, 1972," and the parties "have caused these presents to be executed" on that date.

Wilburs' same lawyer prepared a document entitled "SALE AGREEMENT" for the sale of the business. That document contained the following paragraph:

"Attached hereto and marked 'Exhibit C' and 'Exhibit E' is the earnest money agreement and amendments thereto, the terms of which are incorporated herein, unless otherwise stated in this agreement."

Physically attached were two exhibits, so identified, which were photocopies of the Earnest Money Receipt dated February 21, 1972, signed by the Wilburs and plaintiff, and the supplements above described signed on February 29 and March 1, 1972. The Sale Agreement required plaintiff to pay personal property taxes pertaining to the business and to keep in effect insurance coverage as specified in the Earnest Money Receipt supplement dated February 29, 1972.

Approximately four years later plaintiff orally told

the Wilburs that he desired to exercise the option in accordance with the Sale Agreement. John Wilbur informed plaintiff that he would hear from the Wilburs' lawyer. Under date June 2, 1976, the lawyer who drew the lease and Sale Agreement wrote to plaintiff and told him that the Wilburs had asked the lawyer to reply to plaintiff's query as to the option provisions of the "agreement entered into on March 23, 1972." We find that statement to be inaccurate. Plaintiff had spoken to the Wilburs concerning the option provisions of the Sale Agreement.

By that same letter the lawyer reminded plaintiff that land costs and values in the area were "rising monthly" and that the Wilburs, as corporate officers, were then unable to make a realistic commitment as to the "option price" "for several months yet." The letter informed plaintiff that by December 20, 1976, the corporation would inform plaintiff "of the price asked" if the option were to be exercised in March, 1977.

Plaintiff then for the first time employed a lawyer (Webb) to advise him with respect to this matter. Plaintiff's lawyer took the position throughout negotiations over the next seven months with defendants' lawyer that the agreed purchase price was $425,000, while defendants' lawyer insisted that the lease provision of "not less than $425,000" was controlling.

Eventually, by letter to plaintiff dated November 30, 1977, John Wilbur took a new position:

> "Thank you for the phone call yesterday expressing your desire to purchase the real property at The Keg & Platter. I have discussed this matter with my father [defendant Glenn Wilbur] and our attorney, Mr. Bruce Williams.

> "As you know, in previous discussions with Mr. Norman Webb, our position is that vital and important details were omitted in the contract relating to the option agreement. As a result, we consider the option agreement to be null and void and that the purchase price of the real property is a negotiable matter.

> "We would, however; [sic] consider discussing with you the purchase of the real property based upon todays [sic] fair market value, but only after our sales contract for the business and equipment has been paid in full.

"We look forward with interest to meeting with you at your convenience."

In June of 1978 plaintiff made proposals "without prejudice or recourse" to purchase the property on an installment sale basis for certain prices of about $325,000, with interest to be at nine and one-half or nine and one-quarter percent, depending upon which price might be accepted. Defendants made a counter offer to sell the realty for $800,000, with a down payment of $230,000, and the balance to be paid over 25 years with interest at ten percent. The counter offer contemplated a land sales contract and continued:

"The John Glenn Corporation will not subordinate the contract and will continue to hold the first mortgage on the property until the contract has been paid in full."

Six months later in December, 1978, by letter plaintiff informed defendants that plaintiff "hereby exercises that certain option * * * as more specifically set forth in the Sale Agreement * * * dated March 31, 1972." Plaintiff tendered $123,250, which is 29% of $425,000, as down payment. Plaintiff stated that he had to that date paid $357,128.80 under the lease and that he was therefor entitled to a credit of 15% of that amount, namely, $53,569.32 against the purchase price. Plaintiff stated that he was willing to allow defendants to choose whether to credit that last named amount as part of the 29% down payment or against the remaining balance after the down payment. Plaintiff's letter continued:

"The remaining balance of the total $425,000.00 purchase price will be paid to you after December 31, 1978 at whatever time and in whatever manner you direct. [Plaintiff] has already obtained a loan commitment for the full amount remaining due and is ready, willing and able to pay the remaining balance forthwith if you should so choose. If, however, you desire to spread payment of the remaining balance over a longer period of time, [plaintiff] would be happy to cooperate and will comply with your directions in that regard."

The letter gave defendants until January 15, 1979, to respond and stated that if they did not respond by that day, plaintiff would tender to defendants "the full balance remaining due under the option."

Defendants replied through letter by their lawyer dated January 8, 1979. The letter stated that defendants continued to take the same position as they had for over two years past that the price of the real property was a negotiable matter as evidenced by the "not less than" language of the lease. The letter extended defendants' June, 1978, offer to sell for $800,000 for another 30 days, but with an increase in the amount of interest "to 12 percent on the contract to reflect changing interest rates in the community."

In July, 1979, plaintiff then filed this action asking for a decree of specific performance of what plaintiff contended was the contract of the parties for sale at $425,000. Plaintiff alleged the tender above described and then alleged:

"Plaintiff is still ready, willing and able to pay to the defendants the full purchase price of said property, and plaintiff offers to pay said sum into court for delivery to the defendants upon defendants' execution and delivery of a good and sufficient deed for said property."

The prayer was for a decree directing defendants to make, execute and deliver a warranty deed to plaintiff and "for such other and further relief as the court may deem just and proper."[7]

Defendants' answer was to the effect that there was never a contract to sell for $425,000. There was no allegation of entitlement to attorney fees and no prayer for an award of attorney fees.

Trial was concluded in January, 1981, and after the parties had submitted post-trial briefs the trial judge issued an eight-page letter decision. He concluded that the parties intended to be bound by the Earnest Money Receipt as finally supplemented and amended on March 1, 1972. He stated: "The lease and sales agreements were merely memorials of the pre-existing contract."[8] He held that the contract was not

---

[7] There was also a prayer for attorney fees based upon an attorney fee provision in the Sale Agreement.

[8] Our review of the Earnest Money Receipt of February 21, 1972, and the supplements disclose that the real property owner, John Glenn Corporation, was not identified in those documents and did not purport to be a party to any of those documents. In fact, the only relevant instrument signed by that corporation was the Lease. It would seem that a writing subscribed by that corporation to grant an option for the sale of the realty would have to be proven under the Statute of Frauds, ORS

specifically enforceable.

"The contract is simply too incomplete. The court cannot—in good conscience—fill in all the necessary gaps."

His letter opinion demonstrates that he had in mind the recent decisions of this court in *Howard v. Thomas,* 270 Or 6, 526 P2d 552 (1974); *Van v. Fox,* 278 Or 439, 564 P2d 695 (1977); *Oates v. Stump,* 279 Or 397, 569 P2d 7 (1977); *Seal v. Polehn,* 284 Or 259, 586 P2d 345 (1978); and *Southworth v. Oliver,* 284 Or 361, 587 P2d 994 (1978). He explained that although those cases went far toward enforcement of contracts that were not complete in all terms, he had concluded that this contract was not specifically enforceable even under those recent decisions:

"In recognition of this new direction of the courts, I have made a close examination of the contract in our case, and I have found the gaps are just too plentiful to allow for this court to author some form of sale for these parties.

"Again, referring to the contract, among other things— there is no specification in the contract as to what rate of interest applies. There is no determination as to the time period envisioned for the payment schedule. The contract clearly indicates, however, that a lump sum payment is not acceptable, only 29% of purchase price can be tendered in the year of sale. The contract also makes no provision for the seller's security interest during the pendency of the sale. The agreement also is silent with regard to the payment of real property taxes, insurance obligations, subordination of existing encumbrances and maintenance of the property. Neither is there any mention in the contract whether the sale is to be consummated by deed; or deed, note and mortgage; or by land sales contract.

"Perhaps a court could find justification for supplying one or two of the missing terms listed above. But, even with the

41.580(5). Plaintiff did not do so but did plead that the "defendants" were seized in fee simple of the realty and that the "defendants" had granted the option in writing via the Sale Agreement. All of the defendants answered together and admitted that they were seized in fee simple of the property and expressly averred that the "defendants" had entered into the Lease, although John Glenn Corporation alone had signed the instrument as lessor. The answer also admitted that the "defendants" had signed "certain other preliminary papers."

The case was pleaded and tried by all parties as if either all of the defendants or none of them could be held to specific performance, and that is the reason for our statement in footnote 1, *supra,* that we need not distinguish among them.

recent leniency of the courts in mind, this court cannot salvage a contract that is as deficient as the one in the present case. At the time of this writing, there is no Oregon case in which the court has filled in as many gaps as exist here."

The trial court concluded the letter opinion by noting that there were two matters on which the court would like further help from counsel. The first was attorney fees and the second was whether plaintiff should be entitled to "monetary judgment" for a portion of the "lease credits" which were to be applied to the eventual purchase.

In response, plaintiff submitted a memorandum contending that he was entitled to a judgment for 15% of the payments made under the lease under the law of "restitution." He also contended that he was entitled to attorney fees and costs to be fixed by the court pursuant to the stipulation of the parties.[9]

Defendants submitted a memorandum arguing that the law of restitution did not work in plaintiff's favor in this situation.

The matter was set for oral argument, which was held in October, 1981. The trial court then denied plaintiff's claim for "a monetary award of restitution." With respect to attorney fees the court stated:

"Taking into consideration the general equities of the matter, the outcome of the case, and the silence of defendants' pleading on the issue, I have concluded this is not an appropriate case for the award of attorney fees."

---

[9] During trial of the cause neither party adduced evidence concerning the matter of attorney fees. At the close of plaintiff's case in chief, the following occurred:

"[Plaintiff's counsel]: Your Honor, at this point in time we would be prepared to rest our case I believe predicated upon an assumption that we have requested the Court to award us, should the Court find it proper to do so, and our suit for specific performance, is well founded, reasonable amount for attorney fees and costs. It is my understanding that the Defendants, through [Defendants' counsel], would be willing to stipulate that should the Court make a determination in that regard we could at some point later on supplement the record with regard to expenditures and et cetera.

"[Defendants' counsel]: Your Honor, yes, we will stipulate that the Court may set fees without the benefit of testimony if fees become appropriate either way, and do that on the basis of counsel's affidavit of time."

It was also stipulated at the same point in the record that the calculation of the amount equal to 15% of lease payments would be later fixed by agreement.

The court asked that the "decree" be drawn to reflect the parties' stipulation that $70,207.39 equalled 15% of the amounts paid under the lease.

On appeal by plaintiff, the Court of Appeals tried the cause anew upon the record and agreed with the trial court that the terms of the option to purchase were for $425,000, with no more than 29% to be paid in the year of exercise of the option and with plaintiff to have credit against the purchase price for $70,207.39. In doing so, the Court of Appeals rejected, among other things, defendants' argument that the "integration" clause of the lease, quoted above, established that the price was to be "not less than $425,000."

> "We take this clause to apply only to the agreement between the parties as to the lease itself, and not to the prior documents regarding the sale of the business and the option to purchase. That is the only reasonable interpretation. Otherwise, the clause may be read to cancel and terminate the prior earnest money agreement; but plaintiff clearly would not have executed a lease of the premises without having purchased the business that was being operated there. Even if the earnest money agreement was superseded by the lease, it was expressly incorporated in the subsequent agreement for sale of the business."

62 Or App at 567 fn. 4. The Court of Appeals, based on its interpretation of *Van v. Fox, Oates v. Stump, Southworth v. Oliver,* and *Howard v. Thomas,* all *supra,* and *David M. Scott Construction v. Farrell,* 285 Or 563, 592 P2d 551 (1979), then held that the contract was specifically enforceable.

> "Here, the purchase price, the subject property and the parties have been agreed on. The problem of the missing terms is only an apparent one, used by defendant as an excuse to avoid a contractual obligation. We hold that the contract may be specifically enforced, by payment of 29 percent of the purchase price in the first year and the balance, together with interest at ten percent per annum, in the ensuing year, and conditioned upon plaintiff providing adequate security."

62 Or App at 569. The Court of Appeals then ordered that the cause be remanded to the trial court to enter a decree of specific performance not inconsistent with the Court of Appeals' opinion.

We allowed defendants' petition for review primarily

to determine if the Court of Appeals' decision was supported by the decisions of this court above cited and to try to restate the law to be derived from those decisions. Before going to that matter, however, we should address defendants' contention that the integration clause in the lease bars consideration of the Earnest Money Receipt as supplemented and amended.

Both the trial court and the Court of Appeals held that the parties had arrived at a contract to govern their respective rights and duties when the final supplement to the Earnest Money Receipt was signed on March 1, 1972.[10] Defendants contend that by signing the lease on March 23 plaintiff agreed to something different and that the "integration" paragraph above quoted from the lease bars plaintiff and the courts from enforcing anything other than the option to purchase for "not less than $425,000." We believe that defendants' position is not well taken for various reasons.

■   We agree with the Court of Appeals' reasoning and holding that the "integration" paragraph was only meant to apply to the terms of the lease and not to the sale of the business and the option to purchase for a fixed price. It defies reason to believe that plaintiff would have entered into a lease of the premises for ten years if his contract to purchase the business were to be "cancelled and terminated" by signing the lease.

We agree that the parties had bargained over the terms of the sale, lease and option until agreement was reached on March 1. The insertion of the language "not less than" in the lease was the unilateral act of defendants. There was no negotiation for that important change. There was no consideration to support that new clause. Defendants' contention that their agreement to pay the real property taxes during the term of the lease was consideration for the change is without merit. The negotiations leading up to the signing of the supplement on March 1 demonstrate that plaintiff would

---

[10] It should be kept in mind that the option was only a part of that contract. The parties had also agreed (for the purposes of this litigation) to sale of a going business for $275,000 plus inventory on an installment basis and a ten-year lease of real property at a rental price of at least $42,000 per year for the first five years and thereafter until the option might be exercised. In other words, this contract involved almost $1,000,000.

not agree to defendants' original requirement that the purchaser/lessee should pay such taxes. As of March 1 the contract was silent as to the payment of the taxes. Adding to the lease language to require payment of those taxes by the lessor did not change the agreement or impose any additional duties on the defendants. Where a lease is silent as to the payment of taxes and assessments, they are to be paid by the landlord. *See, e.g., Swetland Bldg. Co. v. Children's Home,* 127 Or 188, 192, 270 P 927 (1928).

Accepting defendants' position for the sake of argument only, we find that the text of the integration paragraph provides that the lease may be amended by written instrument signed by each of the parties. The lease was "made" and "executed" on March 23, 1972. The Sale Agreement was "a written instrument signed" by the parties on March 31, 1972, and fixed the option price at $425,000. Defendants are hardly in a position to argue that there was no consideration for that "amendment" of the option paragraph of the lease.

If it be that the agreement of the parties is to be found in the four corners of the lease and the Sale Agreement, defendants would contend that the agreement is internally contradictory as to the option price. Our answer to that argument would be that because we are both the trier of fact and of law, we would conclude that the true agreement of the parties was for a price of exactly $425,000.

What we have is an option to purchase real property[11] for $425,000, of which no more than 29% could be paid "in year option is exercised," and against which the optionee would have credit for 15% of the lease payments. Obviously, the parties had not reached agreement on the following items that we have concluded are material and important rather than being minor or mere details:

(1) What did the parties intend to be the "year" to which the 29% limitation applies? More than one possibility

---

[11] Defendants have made a belated argument in this court that the real property has not been described sufficiently to permit of a decree for specific performance. Assuming, for the sake of argument, that the Earnest Money Receipt did not adequately describe the real property for these purposes, the parties have at least interpreted the contract to provide an adequate description. The lease contained a legal description of the property.

comes to mind. It could have been intended to be the twelve-month period commencing on the date of first payment on the purchase price.[12] It could have been intended to be the number of the calendar year in which the first payment was made. Obviously, plaintiff chose, after the fact, so to interpret it when he tendered 29% in 1978 and expressed his intention to pay the balance in 1979 on a date less than a month after the tender. On the other hand, at the time of making the contract, the corporation that owned the real property may have intended to fix the year for purposes of its taxable or fiscal year. (There is evidence that in connection with the sale of the business the corporation that owned the business did intend to establish a fiscal year for business and tax purposes that would hinge on the date of sale of the business and payment of the 29%.)[13]

(2)   What did the parties intend at the time of making the contract as to the right or obligation to finance the balance of the purchase price? Their contract is silent in this respect.

(3)   What did the parties intend at the time of making the contract would be the form of the sale? Land sale contract? Deed with note and mortgage back? Trust deed? The contract is silent.

(4)   What did the parties intend at the time of making the contract to govern the fixing of the interest rate on the unpaid balance after an initial payment in any amount up to 29% in the year the option would be exercised?[14] The

---

[12] The "preliminary papers" and the Sale Agreement for the business referred, respectively, to the first 12 month period and the first 11 month period.

[13] I.R.C. § 453(b) made it important to fix the taxpayer's "taxable year" for the purposes of reporting gains on installment sales, which was the most obvious reason for the insertion of the 29% limit. Of course, there would be other important income tax effects turning on the period of time over which the principal balance would be paid. The option did not fix that period. The negotiations, to which reference is made in the text, that occurred between November 30, 1977, and June, 1978, show that the parties were keenly aware of the fiscal importance of fixing that period.

[14] During the negotiations between November, 1970, and June, 1978, the parties discussed annual interest rates ranging from nine and one-quarter percent to twelve percent. The Court of Appeals, without explaining how it arrived at the figure, fixed the interest rate on the unpaid balance at ten percent per annum. It would appear, at first blush, that *if the parties had had any agreement* for payment of interest, but failed to specify the amount, the proper rate would be six percent under former ORS 82.010.

contract is silent.

(5) What did the parties intend at the time of making the contract concerning the subordination of existing liens? There is some, albeit puzzling, evidence in the record indicating that the property was encumbered by a mortgage.

With those unanswered questions in mind, we now turn to a review of the decisions on which the plaintiff, the Court of Appeals and the dissent in this court rely to support the remedy of specific performance. We approach them chronologically.

In *Howard v. Thomas,* 270 Or 6, 526 P2d 552 (1974), a buyer sought specific performance of an earnest money receipt in which defendant had agreed to sell a ranch. The receipt provided for a price of $54,480, for $14,480 as down payment on acceptance of title and delivery of a deed, and the balance to be paid at the rate of $10,000 per year at seven percent interest, but reserving to the seller the right to fix a lesser annual payment. The receipt also allowed the sellers to select and retain ten acres of the ranch, with the buyer to have the right of first refusal on the ten acres. The receipt also acknowledged "an existing timber sale contract with L. Lundgren now on place." The defense was that the receipt was too uncertain to be capable of specific performance.

In deciding *Howard,* this court first acknowledged that in *Smith v. Vehrs,* 194 Or 492, 242 P2d 586 (1952), the rule was thus stated:

"It is a well-established rule of law in this state that equity will not decree specific performance unless the contract is definite, certain and complete. The court cannot make a contract for the parties, nor can it make clear that which is left in doubt and uncertainty. [Citing earlier Oregon cases]. 194 Or at 499."

270 Or at 9. The opinion in *Howard* then stated that this court now prefers a "less restrictive rule" than that of *Smith v. Vehrs, supra,* and set forth the following text in quotation marks:

"The law does not favor, but leans against, the destruction of contracts because of uncertainty; and it will, if feasible, so construe agreements as to carry into effect the reasonable intentions of the parties if that can be ascertained."

270 Or at 10.[15] Carrying out that sentiment, this court found evidence from which the identity of the ten acres could be fixed and resolved all other uncertainties in defendant's favor. Having done so, the court affirmed, as modified somewhat, the trial court's decree for specific performance.

The contract in *Howard* was certain in several material respects not present in the case at bar. The amount of down payment was fixed. The time it was to be paid was on acceptance of title and the delivery of a deed. Although the contract was silent as to the nature of the seller's security, the maximum amount of annual payment to retire the debt and the interest rate on the principal balance were fixed. In the case at bar the courts would have to fill in all of those important terms in order to draw a form of judgment for specific performance.

*Van v. Fox,* 278 Or 439, 564 P2d 695 (1977), was a suit for specific performance of a "joint venture agreement." The principal writing on which the plaintiffs relied as being the contract was a certain "letter of intent." After acknowledging that the letter of intent was imprecise in defining the various rights and duties of the parties, this court found that it was "clear" from the testimony that the parties "share a common understanding of their respective obligations under the joint venture agreement." 278 Or at 442. *From that testimony* this court found that the amount that plaintiffs were to pay defendants was certain and, given that certain amount from which to make other calculations required by the agreement, all other financial terms could likewise be made certain.

We believe *Van* is distinguishable from the case at

---

[15] The opinion cites 11 Williston on Contracts (Jaeger 3d ed) 813, § 1424 for the quotation. An examination of § 1424 shows that Williston had quoted the language directly from *Cal. Lettuce Growers v. Union Sugar Co.,* 45 Cal 2d 474, 481, 289 P2d 785 (1955). That case was *not a suit for specific performance.* It was an action in three counts: the first in assumpsit for money had and received for the reasonable value of commodities sold and delivered, and the second and third counts for damages for breach of contract to buy commodities. The California court in turn had quoted directly from one of its earlier decisions, *McIllmoil v. Frawley Motor Co.,* 190 Cal 546, 549, 213 P 971 (1923), which was an action for money had and received. While holding that a contract involved in the case was not too indefinite to be enforced in the cause before it, the court expressly noted that the party seeking to enforce the contract was *not seeking specific performance.*

It would appear that this was a slender reed on which to adopt a rule for suits in equity for specific performance.

bar in several important respects. Here the evidence at trial did not at all make certain that which had been left uncertain in the contract of the parties. Here the parties dealt at arm's length, while in *Van* the parties were joint venturers and thereby in a fiduciary relationship, one with the other, and we expressly considered that to be important to our decision:

> "[T]hese parties are engaged in a joint venture and, therefore, they will be held to an even higher standard of conduct toward each other than that which would otherwise be applied."

278 Or at 449. In *Van* this court acknowledged

> "[n]either party to a contract should be required to perform additional, material terms to which he did not either explicitly or implicitly agree."

278 Or at 446. In *Van* the court found that the testimony clearly established the "additional, material terms" not presented by the writing. In this case the testimony does not do so; rather, the plaintiffs are asking the court to supply such terms, but not on the basis of evidence given by the defendants upon trial as was the situation in *Van*.[16]

*Oates v. Stump*, 279 Or 397, 569 P2d 7 (1977), was a suit to secure specific performance of an option to purchase real property. The parties had contracted for plaintiff to lease a house and part of the land contained in a rural five-acre tract. The writing gave plaintiff the option to purchase the house and additional land to be fixed by description on defendants' subdividing or partitioning the property. Should plaintiff exercise the option to purchase, plaintiff was to have credit against the purchase price for 40% of the rental payments made. Plaintiff took possession of the property and enhanced the value thereof by planting an orchard.[17] After plaintiff had been in possession for about two years, defendants wrote a letter to plaintiff, in which defendants set forth six alternatives for fixing the amount of land and the price for each alternative. Plaintiff responded by choosing one of the alternatives, which called for purchase of the house and three

---

[16] The decision in *Van v. Fox*, 278 Or 439, 564 P2d 695 (1977), likewise leans on the quotation from 11 Williston on Contracts (Jaeger 3d ed) mentioned in *Howard v. Thomas*, 270 Or 6, 526 P2d 552 (1974). See footnote 15, *supra*.

[17] There is no evidence in the case at bar from which we could find that plaintiff enhanced the value of the property by improving it.

of the five acres. The parties had a further conversation in which they agreed as to the land to be embraced in the sale by fixing its direction from the house. Defendants at that time agreed to have the property surveyed in time to close the deal within the next few weeks. Later defendants refused to follow through with the survey and the sale. In resisting plaintiff's subsequent suit for specific performance defendants contended that the description of the property was too indefinite to permit of a decree for specific performance. The trial judge agreed. We reversed, holding that defendants were being asked to do no more than that to which they had specifically agreed, namely, have the property surveyed. Performance of that specific obligation would fix a description of the three acres for the purposes of a deed and for a decree.

Unlike the case at bar, *Oates* presented the situation of a precise obligation to be performed by the lessors/sellers, performance of which would supply the *only* term not explicitly agreed upon by the parties.

In *Southworth v. Oliver,* 284 Or 361, 587 P2d 994 (1978), the purchaser sought specific performance of a claimed contract for the sale of real property. A writing sent by defendants to plaintiff fixed the asking price and provided for 29% of that price as down payment, with the balance to be paid "over 5 years at 8% interest." Plaintiff wrote to defendants that plaintiff accepted the offer. Later when defendants refused to proceed with sale of the property to plaintiff, plaintiff brought his suit. The primary defense was that there was no contract because the writing fixing the price and terms of payment of the balance was not an offer. The fall-back position of defendants was that if there was a contract, it would not permit of a decree of specific performance because of uncertainty "with the terms" of the security rights of defendants.

We first held that there was an offer and acceptance for an installment sale. We found that the defendants' real reason for failure to perform was not because of the claimed uncertainty as to the security for performance of the contract. We then affirmed the trial court's decree that the parties would be required to sign a "standard printed form document * * * in the form of a printed land sale contract on installment payments, with standard form security provisions." 284 Or at 380.

The only material term supplied by the court was the form of security. We believe it important to note that in *Southworth* we were convinced that the claim of uncertainty was a sham and a pretext for refusing to perform. Even in those circumstances, we now believe that the court went as far as ever it could go in filling in the gaps for the purposes of decreeing specific performance in equity.

In *David M. Scott Construction v. Farrell*, 285 Or 563, 592 P2d 551 (1979), plaintiff sought specific performance of a contract for the sale of realty. The defense was that the parties had never agreed upon an important term concerning the plaintiff's right to have defendant subordinate his security interest to mortgages plaintiff might desire to execute. Our opinion discloses that we had in mind the lengths to which we had gone in *Southworth v. Oliver, supra,* but, nevertheless, we hearkened back to the language in *Smith v. Vehrs, supra,* that we had criticized as being "too restrictive" in *Howard v. Thomas, supra.* We held agreement on subordination to be a material term, not a subordinate detail. We refused to order specific performance because of the failure of the parties to have reached agreement concerning subordination, even though plaintiff had eventually capitulated to the extent of being willing to enter into a contract without any provision for subordination. Plaintiff had also eventually offered to pay cash, which would have made subordination unimportant, but we noted that the earnest money agreement sought to be enforced did not give the buyer the right to pay cash.

*Booras v. Uyeda*, 295 Or 181, 666 P2d 791 (1983), was decided after the Court of Appeals' decision in the case at bar. In *Booras* we cited with approval *Phillips v. Johnson*, 266 Or 544, 556, 514 P2d 1337 (1973), for the proposition that

> "To be entitled to specific performance, a contract must be definite in all material respects, with nothing left for future negotiation."

295 Or at 191. We acknowledged an exception to that rule for "subordinate details of performance," citing *Howard v. Thomas* and *David M. Scott Construction v. Farrell,* both *supra.*

Our mention in *Booras* of the cases previously discussed in this opinion reveals that we had those decisions in mind when we stated:

"A court of equity cannot, under the guise of 'filling gaps' make the contract which it thinks the parties would have agreed to. * * * The court can only enforce an existing agreement which is so definite in its terms that the court can frame a decree to compel performance."

295 Or at 193. We denied specific performance in *Booras* because of the failure of the parties to have reached agreement on material terms of the sale.

Earlier in this opinion we drew attention to material, not subordinate, terms on which these parties had not agreed. Under the more liberal decisions reviewed above a court of equity might be justified making certain one or two of those things left uncertain by the parties by the exercise of "courageous common sense,"[18] but, as the trial judge held, there are just too many unresolved terms here to permit of a decree of specific performance in equity.[19]

In addition to that decision, which disposes of this case, we would summarize generally that, with respect to specific performance in equity, *Smith v. Vehrs, supra,* may be said to mark the conservative end of the spectrum of our cases while *Southworth v. Oliver, supra,* marks the other end. We believe it is fair to say that our decision in *Booras v. Uyeda, supra,* lies between those extremities and that our statement there should govern courts of equity in the future in determining whether judgment of specific performance should be given.

We have already discussed the cases mentioned in the dissent and have drawn attention to factors which distinguish them from the case at bar. We shall now briefly touch on some points mentioned in the dissent that we have not already noted or discussed.

The dissent concedes that the "payment schedule" is

---

[18] 3 Restatement (Second) of Contracts, § 362, comment *b*.

[19] Because the parties pleaded and tried this case on the issue of whether their contract was for a price of $425,000 or not less than $425,000, we have not discussed what might be the effect on the very existence of a contract to purchase that arises from the conduct of the parties from November 30, 1977, to June, 1978. As we discussed in the text of the opinion, defendants took the position by John Wilbur's letter of November 30, 1977, that the option agreement was "null and void." Plaintiff then made a proposal to purchase for about $325,000 on a long term contract. Defendants made a counter offer, which plaintiff did not accept.

a material element, but concludes that there is not disagreement between these parties on this element. This is supposedly so because the dissent finds that plaintiff would allow the defendants to choose to have plaintiff pay the balance in whatever time and manner defendants would fix. It is true that in December, 1978, plaintiff made such an offer in general terms, but that is not the position that plaintiff took seven months later in July, 1979, when he filed this case. *In this case* in his complaint (never amended) he offers to pay *the full purchase price* "upon defendants' execution and delivery of a good and sufficient deed." He does not offer an alternative. Whatever his position was at an earlier time, in this case he has not offered to purchase at 29% to be paid in the first year with the balance to be carried on a "standard form land sale contract" with the defendants retaining title as security.[20]

Even if we were dealing with the situation posited by the dissent, we are convinced that "time and manner" of paying the purchase price in installments entails an agreement on the interest rate. Not only is that entailed, but one would have to be completely oblivious to the real world to perceive that item as a minor or subordinate factor in a sale of property of this magnitude in the years with which we are here concerned.

Before discussing the propriety of a court directing parties to sign and follow "standard" contracts or contractual provisions for sale of realty, we shall briefly turn to the dissent's reliance on Friedman, Contracts and Conveyances of Real Property (4th ed 1984). The dissent refers to a quotation from that treatise at 298 Or at 752, 762. The author's discussion to which the dissent refers concerns the enforceability of "Binders and Memoranda." The quotation follows:

> "A binder qualifies as an enforceable agreement if it includes the essential terms of a contract. These are generally

---

[20] Compare *Booras v. Uyeda,* 295 Or 181, 666 P2d 791 (1983), in which we held that one who seeks to avoid a contractual indefiniteness that would prevent the remedy of specific performance must allege in the complaint the specific relief which he seeks *and the facts showing why that relief is appropriate* and must include a prayer for that relief. As in *Booras,* the plaintiff in the case at bar, by his complaint, seeks to enforce a cash sale *rather* than the installment sale which he alleges to have been the agreement of the parties. Here, plaintiff does allege specifically that the court should decree a cash sale and he has prayed for one, but *he has not alleged why the relief for which he prays is appropriate.*

said to be: (1) the parties, (2) the subject matter, (3) the mutual promises, and (4) the price and consideration and the terms of payment if the sale is not for cash." (Footnotes omitted.)

Friedman, *supra,* at 95-96. We agree with the dissent that it is essential term (4) that is the sticking point in the case at bar.

This particular part of this particular treatise is essentially encyclopedic in nature; *i.e.,* it is the author's collection of a set of statements, holdings and rules by appellate courts. The statements made by the author are footnoted to the decisions purportedly supporting the statements. We say this, not in any way intending to denigrate the work, but to make clear that the quotations from that work that we use herein are believed by the author to be supported by cases cited in footnotes.

We now set forth some of those parts of Friedman's text (adding emphasis but omitting footnotes):

"The majority of binders that are unenforceable are probably defective for failing to state the terms of payment. Frequently, these are not only not stated but have neither been determined nor even considered. They thus run into the rule that there can be no enforceable contract if a *material element* has been left for future negotiations."

Page 103-104.

"A contract providing for deferred payment of the purchase price without specifying the due date is *fatally defective.*"

Page 107.

"Under the majority rule, a memorandum of sale that provides for a purchase money mortgage, *without specification of its maturity or rate of interest,* is unenforceable. The same would, of course, apply where the principal of the mortgage has been left indefinite. *If the purchase money mortgage is prepayable,* the purchaser may treat the transaction as a cash sale by offering full payment and avoiding the problems of uncertainty. New York and New Jersey are in the *minority* in holding that if *no reference is made to* maturity or *rate of interest* the mortgage is impliedly payable on demand and at the legal rate of interest. But even in these states this presumption is not applied where the papers *negate any intention of creating a demand obligation.*"

Page 109-110.

It appears to us that the author's amplification of essential term (4) supports our decision to deny specific performance.

It is true that in *Southworth v. Oliver, supra,* we directed the parties to employ a "printed land sale contract on installment payments, with standard form security provisions." 284 Or at 380. It is true that in *Howard v. Thomas, supra,* this court affirmed the decree of the trial court requiring the seller to accept as his security "a first mortgage prepared on Stevens-Ness [a purveyor of legal forms in the State of Oregon] form No. 105A." A majority of this court believes those portions of those decisions to have been at least unfortunate.

■    If a contractual obligation is sufficiently definite in its material terms to support a judgment in equity for specific performance, the court should be able to draw the judgment so as to set forth specifically those terms. The directive to the parties to employ the "standard provisions" of a "printed land sale contract" appears to be a confession that the court has not discovered the material terms of the agreement that the court is ordering to be enforced. The court's directive itself is hardly specific. There are many printed land sale, installment payment contracts with divers forms of security provisions. Just to mention a few places in which such contracts may be found, we note: 16 Am Jur Legal Forms 2d (rev) (containing some 400 pages concerned with Real Estate Sales Contract forms); Modern Legal Forms (West Publishing Company 1969) (containing almost 300 pages of forms concerning Sale and Purchase of Land); 8 Nichols, Cyclopedia of Legal Forms, Annotated (1980) (containing approximately 200 pages of forms dealing with Sales and Exchanges of Real Estate); and Stevens-Ness forms found in many stationery and book stores in Oregon. A directive to enter into a form contract or mortgage without specifying which one may well result in simply sending the parties off to a new area of disagreement as they each weigh the advantages and disadvantages to themselves of the various printed forms.

In *Howard v. Thomas, supra,* the decree did direct the parties to a specific form. One immediately perceives a danger

in doing that. The court has placed its imprimatur on that form, but it may well be that future litigation will arise, even among the same parties, in which the meaning, indeed the very legality, of those printed provisions may be in issue. What does the court that has approved that form then do?

■ We conclude that judgments for specific performance should themselves spell out what a party is being ordered to do. That would ensure the attention of the court to whether the pleadings and the evidence support any particular text in the judgment.

Although plaintiff's complaint did not include a specific prayer for judgment for 15% of the payments made under the lease, there was a common form of prayer for general equitable relief. Plaintiff urged in the trial court that if the contract would not support a decree of specific performance, he should have judgment for that 15%, which the parties eventually stipulated to be the sum of $70,207.39. The trial court recognized that plaintiff was seeking that amount on a theory of restitution as being an amount paid to defendants over and above rent. After the trial court had denied specific performance, plaintiff argued to the court:

> "The $70,000 plus which plaintiff has paid to defendants over the past ten years is clearly separable from the monthly lease payments. It constituted the bargained for consideration for the option to purchase. This option has been held unenforceable for lack of specificity. Consequently, the plaintiff respectfully asserts that he is entitled to restitution of the sum of in excess of $70,000.00."

The trial court denied the claim but did not explain the basis of that decision.

On appeal plaintiff argued this issue as follows:

> "No basis for the denial was given and Plaintiff submits that under the circumstances of this case, the refusal to grant at least an alternative award of monetary damages was error. *See Walker v. Mackey et al,* 197 Or. 197, 209, 251 P2d 118, 253 P2d 280 (1953) (citing Am. Jur., Specific Performance, 198 §174). *See also Booras v. Uyeda, supra; Burlington Northern, Inc. v. Lester,* 48 Or. App. 579, 617 P2d 906 (1980); *Smith v. Dunn,* 165 Or. 418, 107 P2d 985 (1940); *Vanderpool v. Burkitt,* 113 Or. 656, 234 P 289 (1925); *Oil Shale Corp. v.*

*Larson,* 20 Utah 2d 369, 438 P2d 540 (1968); *Morgan v. Brinkhoff,* 145 Colo. 78, 358 P2d 43 (1960); 58 C.J.S. Money Received, §6(a) (1948)."

We shall examine those authorities seriatim.

*Walker v. Mackey et al, supra,* was indeed a suit for specific performance of a contract to purchase real property in which the court awarded damages for money paid by the buyer pursuant to the contract and for reasonable value of improvements placed on the property by plaintiff while in possession under the contract. The difference between that case and this is that there the trial court and this court found that plaintiff had a contract that was specifically enforceable in equity but that defendants had made performance impossible by sale to a bona fide purchaser for value without notice. Here the trial court and this court have found the contract not to be specifically enforceable in equity. The citation in *Walker* to 49 Am Jur 83 *Specific Performance,* § 67, is likewise inapplicable to this case.

In the respect with which we are now concerned, *Booras v. Uyeda, supra,* is of no help to plaintiff. There the trial court found plaintiff not to be entitled to specific performance of an earnest money agreement for sale of real property but awarded $20,000 as "equitable compensation." As we pointed out, that characterization was not accurate. *See* footnote 2, 295 Or at 187. The Court of Appeals, *Booras v. Uyeda,* 56 Or App 834, 643 P2d 413 (1982), did not reach that issue, for it reversed and ordered specific performance. Defendant had not appealed the trial court's award of $20,000 to plaintiff, and we held that we were precluded from considering that issue. 295 Or at 189. We most certainly did not there pass on the merits of what the trial court decided in making that award.

Reliance on *Burlington Northern v. Lester,* 48 Or App 579, 617 P2d 906 (1980), is misplaced. The case is not concerned in any way with specific performance in equity. The only real holding of that case is that the trial court erred in allowing summary judgment because there were material issues of fact to be tried.

*Smith v. Dunn,* 165 Or 418, 107 P2d 985 (1940), insofar as it is possibly applicable, was an action for money

had and received to recover money paid by plaintiff under a contract, the consideration of which had failed. In the case at bar there is no failure of consideration; we do not even rule that the contract was not enforceable at law as that issue is not presented.

Neither is *Vanderpool v. Burkitt,* 113 Or 656, 234 P 289 (1925), in point. That was an action at law for money had and received, the theory of recovery being that plaintiff had paid out money on a contract that had failed for want of consideration.

We find it difficult to determine exactly what was decided in *Oil Shale Corporation v. Larson,* 20 Utah 2d 369, 438 P2d 540 (1968). That was a case brought under Utah's statute for declaratory judgment proceedings. It appears that plaintiff was seeking to enforce an alleged option contract. Both the trial court and the Utah Supreme Court held that there was nothing more than an "agreement to agree," which was so indefinite that it could not be enforced. Apparently plaintiff had paid $20,000 to defendant after the option period, had it been enforceable, had expired. Defendant offered to return the $20,000 during trial if the court would dismiss the cause. Defendant had contended in defense that the whole contract was too indefinite to be enforced. In all of those circumstances, the court held that the plaintiff was entitled to return of the $20,000. We do not discover any rule of law that we believe applicable to the case at bar.

In *Morgan v. Brinkhoff,* 145 Colo 78, 358 P2d 43 (1960), plaintiff's action was for money had and received. It appears that plaintiff's theory was that defendant had rescinded the contract between the parties for purchase of a business. Both the trial court and the Colorado Supreme Court apparently held that the contract was too indefinite to be enforced in any event. In all those circumstances, it was held that plaintiff was entitled to the return of her down payment. The decision relies in part on our decision in *Smith v. Dunn, supra.*

Plaintiff's final citation is to 58 CJS 916 *Money Received,* § 6(a). That subsection speaks to an action for money had and received to recover money paid on account of a contract which is too indefinite to be enforced. This was not

an action for money had and received.

■ Plaintiff's assertion that he is entitled to return of $70,207.39 for failure of consideration is untenable. When one purchases an option to buy property, he purchases the owner's agreement to sell to him and not to offer to sell or to sell the property to another for the period of the option. Defendants have not breached that agreement here. Our holding in this case is that there was an option contract for sale of realty for a certain price. Although we have concluded that the contract was too incomplete to entitle plaintiff to a decree of specific performance, we have had no occasion to address the question of the enforceability of the contract otherwise, and we do not do so. We do not find that the parties agreed upon the economic rent for the period of the lease and then fixed contract rent in excess thereof as the consideration for granting the option. Instead, the defendants offered a long-term lease at a specified rent and the option as inducement to buy the restaurant business.

The judgment of the Court of Appeals is reversed, and the judgment of the trial court is affirmed.

**CAMPBELL, J.,** dissenting.

I dissent from the result reached by the majority. I would hold that the option to purchase the real property for $425,000 contained in the final earnest money agreement executed by the parties on February 21, 1972, together with the amendments of February 29, 1972, and March 1, 1972 can be enforced by specific performance.

The trial court found the "gaps were just too plentiful" to allow specific performance. The Court of Appeals held there were no missing terms and granted specific performance. The majority opinion holds "there are just too many unresolved terms here to permit a decree of specific performance in equity."

The question is *not* the number of the terms omitted from the option, but rather the nature of the omitted terms. The general theme that runs through the cases and authorities is a court cannot make a contract for the parties. The court

cannot supply essential or material terms, but can fill in the gaps in a valid contract with subordinate or non-essential terms.[1]

The essential terms of a contract to sell real property are:

"(1)   The parties; (2) the subject matter; (3) the mutual promises; and (4) the price and consideration and terms of payment if the sale is not for cash." Friedman, Contracts and Conveyances of Real Property, at 95 (4th ed 1984).

It is my position that the option agreement in question plus the conduct of the parties have supplied all the essential or material terms for an option to sell the real property. Down the road, this court or the trial court on remand should only be required to fill in the gaps in the sale with subordinate or non-essential terms.

To explain this position it is necessary to re-examine some of this court's recent decisions on specific performance. The majority has already discussed these decisions, but the emphasis of this dissent is different.

A part of the difficulty in this area of the law is the dicta in *Smith v. Vehrs*, 194 Or 494, 242 P2d 586 (1952). This case has been the starting point in the recent history of this court's consideration of cases dealing with the specific performance of real estate contracts. There we said:

"It is a well-established rule of law in this state that equity will not decree specific performance unless the contract is definite, certain and complete. The court cannot make a contract for the parties, nor can it make clear that which is left in doubt and uncertainty." 194 Or at 499.[2]

---

[1]This is not a question of counting the gaps. In *Howard v. Thomas,* 270 Or 6, 526 P2d 552 (1974), the defendant sellers' answer set out "31 items which they contend are necessary elements in a contract to sell real property and which were not included in the earnest money receipt." This court found that most of the 31 items were inconsequential or were eliminated by the decree entered by the trial court. We should not be engaged in trying to determine what a careful lawyer would have provided in an option to buy real estate, but rather what are the barebones essential terms that will bind the parties.

[2]It appears that the quoted statement from *Smith v. Vehrs, supra,* is dicta. The case continues: "however, it is unnecessary for us to decide whether this particular contract is so indefinite and uncertain in its terms as not to be subject to specific performance, because we are of the opinion that, under the evidence in this case, that agreement was completely merged in the deed * * *." 194 Or at 500.

The opinion continued by quoting from *Berry v. Wortham*, 96 Va 87, 89, 30 SE 443 (1898), as follows:

"It is an elementary doctrine of courts of equity that they will not specifically enforce any contract unless it be complete and certain * * * it must be complete in all its parts; that is, all the terms which the parties have adopted, as portions of their contract, must be finally and definitely settled, and none must left to be determined by future negotiations; and this is true without any regard to the comparative importance or unimportance of these several terms."

In *Phillips v. Johnson*, 266 Or 544, 514 P2d 1337 (1973), the earnest money receipt did not provide whether the transaction was to be completed by a deed and mortgage or a land sale contract. The receipt did provide for annual payments "on or before July 30" of each year. This court held that the earnest money receipt was not sufficiently definite to be enforced as an installment sale, but that it could be enforced as a cash sale because of the purchaser's privilege to pay "on or before" a date certain. We also mentioned that it had been suggested that the part of *Berry v. Wortham, supra,* quoted in *Smith v. Vehrs, supra,* applied only to essential contract provisions and had no application to "mere details," but that we need not decide the question at that time.

In *Howard v. Thomas*, 270 Or 6, 526 P2d 552 (1974), this court affirmed a decree requiring specific performance of an earnest money receipt. Among other things the defendants sellers complained that the earnest money receipt made no provision as to the rights of the parties in the event a third party defaulted on a timber contract on the property. This court found that on trial the plaintiff's counsel had by a judicial admission stated that, in the event of default, the balance of the timber should belong to the defendants and that the decree should so provide. We said that with "respect to a specific performance of contracts for the sale of land we prefer a less restrictive rule than that announced in dicta in *Smith v. Vehrs, supra.*" 270 Or at 10.

This court also said:

"We believe that the earnest money receipt was sufficiently definite and certain to justify specific performance. The problems of any consequence which seemed to bother defendants at the time of trial were * * * resolved in favor of

defendants by the decree of the court. The law is well established that the court, under proper circumstances, may in its decree providing for specific performance will [sic] in any 'gaps' appearing in the contract. As Professor Williston states: 'If there is sufficient intent expressed to make a legally valid contract, a court of equity can make certain by its decree, within reasonable limits, subordinate details of performance which the contract itself does not state. * * *' 11 Williston on Contracts (3d ed) 814, § 1424." 270 Or at 13.

In *Van v. Fox*, 278 Or 439, 564 P2d 695 (1977), this court affirmed a decree granting specific performance of a joint venture agreement to develop real property.[3] It was observed that the plaintiffs had expended considerable time and money in performing their obligations under this agreement. For the first time, in this line of cases, we took into consideration a situation where the contract has been partly performed. We quoted from Pomeroy, Specific Performance of Contracts, 378-79, §145 (3d ed 1926):

> "* * * [W]hen a *contract has been partly performed* by the plaintiff, and the defendant has received and enjoys the benefits thereof, and the plaintiff would be virtually remediless unless the contract were enforced, the court, from the plainest considerations of equity and common justice, does not regard with favor any objections raised by the defendant merely on the ground of the incompleteness or uncertainty of the agreement. *Even if the agreement be incomplete, the court will then, in furtherance of justice and to prevent a most inequitable result, decree a performance of its terms as far as possible,* although, perhaps, with compensation or allowance." (Emphasis in original.)

In *Oates v. Stump*, 279 Or 397, 569 P2d 7 (1977), this court reversed the trial court and granted specific performance of an option contained in a lease. The defendants leased the plaintiff a residence and gave her an option to purchase the residence plus a machine shed and three acres of adjoining land for $36,300 on the expiration of the lease. The rent was $250 per month of which $100 was to be allowed as a credit on the purchase price. The defendants refused to honor the

---

[3]In footnote 4 of *Van v. Fox, supra,* we recognized that one of our conclusions "may be in conflict with dicta in *Smith v. Vehrs,* 194 Or 492, 500, 242 P2d 586 (1952)." However, the dicta were specifically rejected as too "restrictive" in *Howard v. Thomas,* 270 Or 6, 10, 526 P2d 522 (1974).

option on grounds that the description of the property was too indefinite to allow a decree of specific performance. The plaintiff had made improvements to the property in reliance upon the option and had paid sufficient rent to be entitled to a credit of $2,400. This court required the defendant sellers to have the property surveyed. We said:

"Recently, in the case of *Van v. Fox,* 278 Or 439, 564 P2d 695 (1977), we pointed out that equity courts have been reluctant to declare a contract too indefinite to allow for specific performance when the plaintiff has partially performed the agreement." 279 Or at 401.

We also again quoted the above rule from Pomeroy, Specific Performance of Contract, 378-79, §145 (3d ed 1926).

In *Seal v. Polehn,* 284 Or 259, 586 P2d 345 (1978), this court held that a complaint asking for the specific performance of an earnest money receipt stated a cause of suit when tested by a demurrer alleging that the receipt was too indefinite. We quoted from 11 Williston on Contracts 813, §1424 (3d ed 1968):

"The law does not favor, but leans against the destruction of contracts because of uncertainty; and it will, if feasible, so construe agreements as to carry into effect the reasonable intentions of the parties if that can be ascertained."

In *Southworth v. Oliver,* 284 Or 361, 586 P2d 994 (1978), the defendants sellers contended that there was no binding contract capable of specific enforcement because there was no provision for a "security device." This court held:

"Under the facts and circumstances of this case, the absence of agreement upon terms of 'security provisions' was a 'gap' in 'subordinate details of performance' of such a nature as to be properly 'made certain' by a decree of specific performance in a court of equity." 284 Or at 380.

This court went on to affirm the trial court which required the parties to sign a printed sale contract form providing for installment payments and standard security provisions.

In *David M. Scott Construction v. Farrell,* 285 Or 563, 592 P2d 551 (1979), the plaintiff filed a suit for the specific performance of an earnest money agreement. One of the provisions of the agreement provided that if a financial

institution required subordination to a first mortgage the seller agreed to do so on mutually agreeable terms. The plaintiff buyer tendered to the defendant seller a proposed contract that required the defendant to subrogate his interest to any mortgage the plaintiff obtained regardless of the terms or amount of the mortgage. The defendant rejected this offer and countered with four other alternatives which were unacceptable to the plaintiff. This court denied specific performance. We cited *Smith v. Vehrs, supra; Phillips v. Johnson, supra; Southworth v. Oliver, supra* and *Seal v. Polehn, supra;* and said:

> "It follows that the important distinction to be made is between the 'material' terms of a contract, which must be agreed upon in sufficiently definite terms before there exists a valid contract which may be enforced by a decree of specific performance, and the non-material terms or 'subordinate details of performance.'" 285 Or at 572.

*Booras v. Uyeda,* 295 Or 181, 666 P2d 791 (1983), is this court's most recent case on specific performance of an agreement to convey real property. The earnest money agreement provided that the purchaser Booras and the seller Uyeda were to enter into a land sale contract. It was to provide for the gradual release of property as the contract balance was reduced and for a security interest in other property because Uyeda was subordinating her security interest to a first mortgage from Booras on the property being sold. The parties were unable to agree on the terms of these additional provisions. We held that the earnest money agreement was not specific enough to be enforced. We said:

> "To be entitled to specific performance, a contract must be definite in all material respects, with nothing left for future negotiation. *Phillips v. Johnson,* 266 Or 544, 556, 514 P2d 1338 (1973). The foregoing proposition is subject to an exception that '* * * [i]f there is sufficient intent expressed to make a legally valid contract, a court of equity can make certain by its decree, within limits, subordinate details of performance which the contract itself does not state.' *Howard v. Thomas,* 270 Or 6, 13, 526 P2d 552 (1974); accord, *David M. Scott Construction v. Farrell,* 285 Or 563, 572, 592 P2d 551 (1979)." 295 Or at 191-92.

We then continued:

> "True, this court in recent years has adopted a 'less

restrictive rule' (less restrictive than the rule announced in *Smith v. Vehrs,* 194 Or 492, 242 P2d 586 (1952)) in favor of construing agreements so as to carry into effect the reasonable intentions of the parties. *Howard v. Thomas,* 270 Or 6, 10, 526 P2d 552 (1974)." 295 Or at 193.

The above cases starting with *Phillips v. Johnson, supra,* and running through *Booras v. Uyeda, supra,* are basically consistent. They demonstrate the statement in 11 Williston on Contracts §1424 at 819 and note 15: "The decisions reveal a trend toward greater liberality in enforcement * * *." They also fit into the following observations in 5A Corbin on Contracts Section 1174 at 283:

> "There are cases in which the court made a mountain out of a molehill and refused a decree that might well have been granted. Apparent difficulties of enforcement that arise out of uncertainties in expression often disappear in the light of courageous common sense and reasonable implication of fact."[4]

Our treatment and interpretation of *Smith v. Vehrs, supra,* has not always been consistent. As we previously pointed out in footnote 2, *supra,* all of the statements in that case referring to the specific performance of uncertain and indefinite contracts are dicta. The most often quoted portion of *Smith v. Vehrs, supra,* is:

> "It is a well-established rule of law in this state that equity will not decree specific performance unless the contract is definite, certain and complete. The court cannot make a contract for the parties, nor can it make clear that which is left in doubt and uncertainty." 194 Or at 499. *See Howard v. Thomas, supra; Landura Corp. v. Schroeder,* 272 Or 644, 539 P2d 150 (1975); *David M. Scott Construction v. Farrell, supra; Fleck v. Steinbeck,* 44 Or App 161, 165, 605 P2d 717 (1979).

In light of our more recent cases the above statement from *Smith v. Vehrs, supra,* would be correct if it were interpreted to read:

> It is a well-established rule of law in this state that equity

---

[4]Comment b to § 362 of Restatement (Second) Contracts concerning specific performance states: "Apparent difficulties of enforcement due to uncertainty may disappear in the light of courageous common sense."

will not decree specific performance unless the *material or essential* terms of a contract are definite and certain. The court cannot make a contract for the parties.

The other parts of *Smith v. Vehrs, supra,* on this subject including the quote from Virginia case of *Berry v. Wortham, supra,* should not be the law of Oregon.

This dissent now returns to the merits of this case. To support their position, the defendants call our attention to the trial court's findings that the earnest money receipt was too uncertain to be enforced because it omitted:

(1) The payment schedule;

(2) The interest rate;

(3) Form of sale (deed with a note and mortgage back or a land sale contract);

(4) The seller's security interest;

(5) The allocation of real property taxes, insurance and maintenance;

(6) The subordination of existing mortgages.[5]

I agree that a payment schedule is a material element of the contract. *See* 11 Williston on Contracts § 1424 p 816 (3d ed 1968), *post* at 19; Friedman Contracts and Conveyances of Real Property, at 95 (4th ed 1984). However, there is no disagreement between these parties. The plaintiff by his tender in December 1978, offered to pay the principal balance "at whatever time and in whatever manner" the defendants directed.[6] That is, the plaintiff would pay all cash, or would pay the principal balance in whatever installment amounts the defendants chose. It is up to the defendants to make a choice as to how they want to receive the payments. This is no different than *Howard v. Thomas, supra,* where we approved a decree by the trial court which gave the defendants sellers the

---

[5]The defendants in their brief in the Court of Appeals paraphrased the trial court's findings and set out a list containing the above items. I have further paraphrased the trial court's findings and have rearranged the order of the list of omitted items to fit the analysis in this dissent.

[6]The majority implies that later when the plaintiff filed his complaint in this case, he withdrew this offer. I disagree. I find nothing inconsistent in the offer of December 1978 and the complaint filed in July 1979.

election "to have the promissory note [representing the unpaid balance] * * * paid on a monthly, quarterly, semi-annual or annual basis."

5A Corbin on Contracts Section 1174, at 289, deals with this problem as follows:

"The fact that the defendant is given a choice between alternative modes of performance does not make the contract too indefinite or uncertain for specific performance. This is true whether the contract is in form an alternative contract or otherwise. The court may properly order the defendant to make a choice, and in default of his doing so may make the choice and compel specific performance in accordance therewith."

The Restatement Second Contracts Section 362 in Comment b states in part:

"A contract is not too uncertain merely because a promisor is given a choice of performing in several ways, whether expressed as alternative performances or otherwise. He may be ordered to make a choice and to perform accordingly, and, if he fails to make the choice, the court may choose for him and order specific performance. Even though subsidiary terms have been left to the determination by future agreement, if performance has begun by mutual consent, equitable relief may be appropriate with the court supplying the missing terms so as to assure the promisor all advantages that he reasonably expected."

The option was given in February 1972. It could not be exercised during the first five years of the lease. It may be that the parties could not see five years into the future and left the details of the option to be worked out at the time it was exercised. In *Van v. Fox, supra,* 278 Or at 450, this court commented:

"It is not unusual for parties involved in complicated business transactions to allow subsidiary details to remain unspecified until such time as the need for agreement actually arises."

The second omitted item on the defendants' list is the "interest rate." The payment of interest was not an essential term of the contract — the parties could have contracted to sell and buy the property without the payment of interest. However, it is obvious that the parties intended to charge and

pay interest if this is not a cash sale. The same earnest money receipt provided for seven percent interest on the sale of personal property and goodwill of the restaurant business. The parties were strangers who never met face to face. 11 Williston on Contracts, *supra,* Section 1424 at page 816 (3rd ed 1968) states:

"It is generally held that uncertainty in the terms of payment is a defect in an essential rather than a subordinate provision; however, where the contract contains no provision as to rate of interest, it will be presumed that the legal rate was intended."

If the defendant sellers elect under the option to receive cash there will be no interest due. On the other hand, if the defendants sellers elect to receive the balance due in installments, then interest will start to run from the date the sale is closed. However, I would hold that the legal interest rate should be determined as of the date on which the parties entered into the earnest money agreement — February 21, 1972. At that time ORS 82.010 provided:

"(1)  The legal rate of interest is six percent per annum and payable on:

"* * * * *

"(e)  Money due or to become due where there is a contract to pay interest and no rate specified."[7]

I would interpret the meaning of ORS 82.101(1)(e) to include that the legal interest rate shall be six percent when money is to become due on an *implied* contract to pay interest.

The third omitted item on defendants' list is the "form of sale" — that is , should the defendant sellers give the plaintiff buyer a deed and take back a promissory note secured

---

[7]The result would be the same if we selected December 1978, when the plaintiff tendered the down payment to the defendants as the date on which the interest rate would be determined. The quoted portion of ORS 82.010 remained the same.

The defendants in their Petition for Review in this court have suggested that if this case is remanded for further proceedings, there should be an opportunity to "determine a rate of interest which bears some reasonable relationship to prevlanet market conditions." The defendants cite *French v. Boese,* 50 Or App 369, 623 P2d 1070 (1981), which was remanded to determine among other things the "going rate" of interest. In the *French* case, there was testimony that the plaintiffs would be able to buy their property back for a principal sum to be determined plus the "going rate" of interest. There is no testimony in this case that the parties agreed to the "going rate."

by a mortgage on the property sold, or should the parties execute a land sale contract wherein the sellers would retain title until the balance of the purchase price is paid? This exact question was before this court in *Southworth v. Oliver, supra.* There the defendants contended that the contract could not be specifically enforced because " 'all of the elements essential to a contract were not agreed upon by the parties' in that 'the security device was not agreed upon.' " 284 Or at 378.

The trial court required the parties to sign a printed form land sales contract providing for standard security provisions. This court affirmed the trial court:

"We also believe that the terms stated in defendants' written offer, as accepted by the plaintiff, resulted in a contract which was sufficiently definite and certain to justify specific performance. Under the facts and circumstances of this case, the absence of agreement upon terms of 'security provisions' was a 'gap' in 'subordinate details of performance' of such a nature as to be properly 'made certain' by a decree of specific performance in a court of equity." 285 Or at 380.

We mentioned that previously in *Howard v. Thomas, supra,* we affirmed a trial court that required the defendant sellers accept a standard printed form mortgage.

I would hold that in this case the parties be required to execute a standard land sale contract. If there is any dispute as to the form of land sale contract, I would allow the trial judge to make that choice on remand.[8] I would require a contract instead of a mortgage because it is simpler and fits the circumstances of this situation. Also the defendants, by their counter-offer in January 1979, indicated that they preferred the balance of the purchase price be "carried on a contract." Everything else being equal, a seller of real property is provided with more protection if the sale is by a conditional sales contract instead of conveying the property by deed and receiving a mortgage for security.

---

[8]I agree with the majority that this court should not put its stamp of approval on any particular form of sales contract. That should be left for the trial court to determine under the particular circumstances of each individual case. The briefs in *Howard v. Thomas,* 270 Or 6, 526 P2d 552 (1974), disclose that the trial court ordered the defendants sellers to accept a "first mortgage prepared on Stevens-Ness Form No. 105A" because the plaintiff buyer had tendered a mortgage on that particular form and it was not objected to be sellers.

Still left for consideration are the omitted items of "sellers' security interest, allocation of real property taxes, insurance and maintenance," and "subordination of existing mortgages." A standard form land sale contract should provide that the sellers are not required to convey the property until the purchase price is paid in full. The fact that the sellers will keep the title to the property solves any "security interest" problem. The same contract should provide that the purchasers will pay the taxes when due and keep the property insured at their expense. Standard form contracts provide that the purchaser will keep the property in "good condition and repair and will not suffer or permit waste." By virtue of the execution of a sale contract there is no "subordination of existing mortgages" problem. Any existing mortgage is still a lien on the property and sellers should be required to make the mortgage payments promptly when due. This demonstrates that a standard form contract is a "gap filler." No one has ever argued that a party can buy a standard form contract that has the essential terms of the agreement previously "filled in" or completed.

In addition to the omitted items relied upon by the trial court, the majority asks: "What did the parties intend to be the 'year' to which the 29% limitation applies?" This does not involve an essential term. The option agreement provides: "Down payment and principal payments may not exceed 29 percent in year option is exercised." The majority wonders if the parties intended a calendar year or a fiscal year. At best the majority points out that "year" may be a latent ambiguity that may be cured by extrinsic evidence. The plaintiff has agreed to make the payments "at whatever time and in whatever manner" the defendants desire. The provision of "not more than 29%" was previously included in contracts for the sale of real estate to qualify the transaction for installment sale treatment under the federal income tax provisions. That provision of the Internal Revenue Code limiting the amount of principal received in the year of the sale to not more than 30 percent of the sale price has been repealed.

At the risk of being redundant it is important to say this case boils down to whether the option contained in the earnest money receipt in question omitted any of the essential or material terms. As previously set out in Friedman, Contracts and Conveyances of Real Property, *supra,* there are four

essential terms for an enforceable contract: "(1) the parties; (2) the subject matter; (3) the mutual promises; and (4) the price and consideration and the terms of payment if the sale is not for cash." The trial court, the Court of Appeals, the majority opinion and this dissent all in effect agree that there is no question as to the parties, the subject matter, mutual promises, price and consideration. That leaves only "the terms of payment" in question.[9]

In both *Oates v. Stump, supra,* and *Van v. Fox, supra,* this court quoted from Pomeroy, Specific Performance of Contracts, *supra,* to the effect that when a contract has been partly performed, the defendant has received the benefits and the plaintiff is without a remedy unless the contract is enforced, a court of equity will not favor objections merely on the ground of the incompleteness or uncertainty of the agreement. Professor Pomeroy has described this case. The plaintiff testified that he would not have purchased the restaurant business without an option to purchase the real property. At the time of trial, 15 percent of the lease payments previously made by the plaintiff would have given him a credit of $74,123.72 toward the purchase price under the option. Both the trial court and the majority have held that the plaintiff has no remedy by way of restitution. This leaves the plaintiff virtually remediless unless the contract is enforced. Pomeroy, Specific Performance of Contracts, *supra.*

In some of its previous cases, including *Howard v. Thomas, supra,* and *Van v. Fox, supra,* this court has considered the defendant seller's motives in refusing to comply with the terms of the contract. In this case the Court of Appeals said:

> "The problem of the missing terms is only an apparent one, used by the defendants as an excuse to avoid a contractual obligation." 62 Or App at 569.

The Court of Appeals was correct. The defendants have been falling trees and blowing up bridges along their retreat route into the safe haven of higher prices.

---

[9]No doubt there are other cases like *Booras v. Uyeda,* 295 Or 181, 666 P2d 791 (1983), and *David M. Scott Construction v. Farrell,* 285 Or 563, 592, P2d 551 (1979), where other terms peculiar to a contract to convey property are material. In both *Booras* and *David M. Scott Construction,* subordination agreements were essential to complete the sales. That problem does not exist in this case.

I am not saying that part performance and lack of another remedy by the buyer or the motive of the seller should be controlling factors in a specific performance case. I think that they should be taken into consideration and in a close case they should tip the scales in favor of specific performance. In this case to do otherwise would create a gross injustice.

For all these reasons I would grant specific performance.

Linde, J. and Roberts J. join in this dissent.