Argued and submitted February 2, affirmed May 31, 1995

Keith A. MILLER
and Ivanna D. Miller,
husband and wife,
*Appellants,*

*v.*

Raymond C. OGDEN,
*Respondent.*

(91P-1247; CA A81755)

896 P2d 596

George W. Kelly argued the cause and filed the briefs for appellants.

Ron MacDonald argued the cause and filed the brief for respondent.

Before Deits, Presiding Judge, and Edmonds and Haselton, Judges.

HASELTON, J.

Edmonds, J., concurring.

## HASELTON, J.

Plaintiffs, Keith and Ivanna Miller, appeal from an adverse judgment on their claims for specific performance of a contract to convey real property and for foreclosure of construction and nurseryman's liens. We review *de novo*, ORS 19.125(3), and affirm.

These facts are undisputed. Defendant Ray Ogden owned an 80-acre parcel of agricultural land that he planned to partition into two 40-acre parcels. The Millers, husband and wife, were interested in purchasing one of the 40-acre parcels, and on September 2, 1990, the parties met at the site and signed a memorandum of an agreement to purchase the land. That memorandum described the land to be sold and stated a purchase price of $42,500, but otherwise noted that "the contract for sale * * * will be negotiated at a later date between the parties. This is not an integrated contract." Later in September 1990, the parties signed a handwritten "Memorandum of Contract Agreement" ("memorandum"), which stated:

> "Buying 40 acres from Ray Ogden. The price is $42,500. in T7S, R5W, sec 31. Willamette Meridian in Polk County. $2,500 down on or about Oct 15, 1990. Balance of $40,000 to be paid begin[ning] April 15, 1991 at interest rate of 9.75% for 30 years with a balloon of the balance on April 15, 1999.[1]

> "Millers agree to take care of 3 horses & 3 cows in exchange for no interest being charged for a period to April 15, 1991. Feed and housing of horses and livestock to be supplied by Ray Ogden. All fees associated with the horses (i.e. vaccinations, exams or operations) upkeep to be born by Ray Ogden.

> "Actual Contract to be typed and signed on delivery of $2500 to Ray Ogden.

> "Any future logging 50% of gross timber receipts will be applied to a reduction of principle until April 15, 1995."

On October 15, the surveying and partitioning of the 80-acre parcel had not yet occurred; thus, at plaintiffs' request defendant agreed to extend the down payment due date until the property was surveyed. Between October 1990 and May 1991, the parties were in occasional telephone contact, and, in early

---

[1] Expert testimony at trial established that those terms would require monthly payments of $343.67.

June, defendant visited plaintiffs to request payment. Plaintiffs were either unwilling or unable to make the down payment.[2] In all events, as of early June 1991, the $2,500 remained unpaid, and the survey had not been completed.

Soon thereafter, defendant consulted with his attorney. On June 17, defendant's attorney wrote to plaintiffs, opining that he did not believe the memorandum was binding and enclosing an earnest money agreement. The earnest money agreement varied from the memorandum in that it specified $400 monthly payments, provided for a prepayment penalty, and required that plaintiffs waive any adverse possession claims they might have against neighboring properties. In addition, it required an earnest money deposit of $500 at the time of signing and a payment of $2,000 on the acceptance of title and delivery of deed or contract. Plaintiffs countered with their own proposed earnest money agreement, which provided for payments of $400 per month, but excluded the prepayment penalty and adverse possession provisions. Plaintiffs' proposal included an earnest money payment of $1,191.85, with the balance of the $2,500 down payment due on the acceptance of title and delivery of deed or contract.[3] When defendant did not accept plaintiffs' proposal, they sued to specifically enforce the memorandum and to foreclose liens for improvements to the property, which plaintiffs had allegedly made with defendant's consent or acquiescence between September 1990 and August 1991.

The trial court concluded that there was never a "meeting of the minds" between the parties and, consequently, that the memorandum did not constitute a valid and enforceable contract. The court further determined that, in any event, the memorandum was not susceptible of specific performance because "[t]here are too many gaps and unresolved issues for the court to fill in those matters." Finally, the court rejected plaintiffs' lien foreclosure claims.[4]

---

[2] Plaintiffs testified that they continued to refuse to pay the down payment because the survey had not been completed. Defendant testified that plaintiffs did not pay because they lacked funds.

[3] There appears to be no evidence in this record that plaintiffs ever tendered the entire down payment. However, defendant does not assert that that failure represents an alternative basis for affirming the denial of specific performance.

[4] The evidence pertinent to plaintiffs' lien foreclosure claims and the trial court's disposition of those claims are described below. 134 Or App at 595.

■       Plaintiffs first assign error to the trial court's denial of their claim for specific performance. In particular, they argue that the memorandum is an enforceable contract, with sufficiently definite and complete terms to warrant specific performance. We disagree. Even if we were to assume that the memorandum embodied a contract, it is not sufficiently definite to be enforceable in equity by specific performance. *See Phillips v. Johnson*, 266 Or 544, 554, 514 P2d 1337 (1973) (court's analysis presumed that alleged agreement might constitute a contract, but might still be too indefinite to permit specific performance). *Accord Booras v. Uyeda*, 295 Or 181, 191 n 7, 666 P2d 791 (1983).[5]

Oregon courts, while acknowledging the dictates of "courageous common sense" in permitting specific performance, *Genest v. John Glenn Corporation*, 298 Or 723, 744, 696 P2d 1058 (1985), have nevertheless been reluctant to engage in substantive "gap-filling":

> "To be entitled to specific performance, a contract must be definite in all material respects, with nothing left for future negotiation.
>
> "* * * * *
>
> "A court of equity cannot, under the guise of 'filling gaps' make the contract which it thinks the parties would have agreed to." *Booras*, 295 Or at 191, 193.

In particular, we and the Supreme Court have refused to compel specific performance of land sale contracts that do not specify the form the sale is to take. *See, e.g., Genest*, 298 Or at 738; *cf. Phillips*, 266 Or at 556-57.[6] Moreover, we have declined to require specific performance of a contract for the sale of land that was subject to deferred tax treatment, when the contract was indefinite or ambiguous as to the parties'

---

[5] In *Booras*, the court observed:

"It has been held that a contract may be sufficiently definite to support an award of damages but not sufficiently definite to be specifically performed. *Glazer v. Glazer*, 374 F2d 390, 404 [(5th Cir), *cert den* 389 US 831 (1967)] (applying Ohio law). *Gulbenkian v. Gulbenkian*, 147 F2d 173, 175 (2d Cir 1945). *Also cf.* Restatement (Second) of Contracts § 362, *Comment a.* (1981). *But see Landgraver v. DeShaver*, 239 Or 446, 448, 398 P2d 193 (1965)." *Id.*

[6] In *Phillips*, the court conditioned specific performance on the buyers' prompt payment of the entire purchase price in cash. That disposition rendered the parties' failure to specify the form of the sale and terms of payment immaterial.

responsibility for deferred taxes. *Tallman v. Floran*, 53 Or App 65, 70, 630 P2d 918 (1981).

Here, the memorandum states that the "actual contract [is] to be typed and signed on delivery of $2500." That phrase unambiguously expresses the parties' understanding that a subsequent agreement embodying the sale terms would be signed. Indeed, both parties testified that they anticipated that defendant's attorney would draft the "actual contract" and that it would contain additional terms.

The course of dealings between the parties, both before and after the drafting of the memorandum, demonstrates that the memorandum did not address certain substantive concerns. For example, Keith Miller testified that he was concerned about apportionment of property taxes, including responsibility for deferred taxes on the property as farm land,[7] reforestation obligations, a septic permit, and easements. Yet the memorandum did not address any of those matters. In addition, the memorandum did not specify the form of sale (*e.g.*, land sale contract, trust deed, deed with note and mortgage back) that the parties agreed to use. *See Genest*, 298 Or at 737-38 (the form of sale is a material and important term); *Phillips*, 266 Or at 556-57 (the form of sale is not "unimportant" or "mere detail").[8] Further, the parties' ultimate inability to agree about prepayment provisions and waiver of adverse possession claims suggests the materiality of these terms to the parties. *See Tallman*, 53 Or App at 70 (parties' actions after an initial agreement can evince materiality of terms to those parties).

Thus, the memorandum here suffers from deficiencies similar to those that precluded specific performance in

---

[7] Under ORS 308.404, property taxes were deferred on the subject property.

[8] Plaintiff Keith Miller testified:

"I told Ray, we've got to have a *land sale contract or something like that* to put everything into escrow. And so I said, I'll just call it an actual contract." (Emphasis supplied.)

Miller's deposition testimony was similarly equivocal on the nature of the conveyance:

"The final contract we're talking about, *the land sales contract or deed of trust, whatever it was,* that I thought we should have an attorney look at it to make sure that we would have everything that's required." (Emphasis supplied.)

*Genest, Booras,* and *Tallman.*[9] The trial court properly refused to engage in a course of wholesale gap-filling. Accordingly, we affirm the denial of specific performance.[10]

■ In their second and third assignments of error, plaintiffs contend that the trial court erred in denying their request for foreclosure of construction and nurseryman's liens. Because plaintiffs' lien foreclosure claims are suits in equity, we review *de novo.* ORS 87.060(1); *see United Engine Parts v. Reid,* 283 Or 421, 428, 584 P2d 275 (1978).

Between September 1990 and August 1991, plaintiffs repaired a barn and excavated and filled a road on defendant's property. They also planted an orchard on the property. In January 1991, defendant visited the property and noticed the barn repairs and road work. In August 1991, after relations between the parties had broken down, defendant ordered plaintiffs off the property. Plaintiffs then filed construction and nurseryman's liens for the improvements. ORS 87.010; ORS 87.358. The trial court concluded that plaintiffs "completely failed to prove" their claims.

Plaintiffs contend that they are entitled to judicial foreclosure of their construction lien, because they improved

---

[9] The concurring opinion, in disagreeing with our specific performance analysis, invokes *Southworth v. Oliver,* 284 Or 361, 587 P2d 994 (1978). 134 Or App at 600-01. We note, however, that, in *Genest,* the court, in reviewing the "spectrum" of Oregon cases addressing the availability of specific performance, characterized *Smith v. Vehrs,* 194 Or 492, 242 P2d 586 (1952), as marking the "conservative" or restrictive limit of that precedential range and *Southworth* as marking "the other end." 298 Or at 744. The court concluded:

"We believe it is fair to say that our decision in *Booras v. Uyeda, supra,* lies between those extremities and that our statement there should govern courts of equity in the future in determining whether judgment of specific performance should be given." *Id.*

We note, further, that no post-*Genest* appellate decision has cited either *Southworth* or *Smith.*

[10] Plaintiffs invoke a series of cases in which the Supreme Court, or we, have ordered specific performance. *E.g., Van v. Fox,* 278 Or 439, 564 P2d 695 (1977); *Howard v. Thomas,* 270 Or 6, 526 P2d 552 (1974); *Boese v. Knight,* 104 Or App 559, 802 P2d 675 (1990); *Spinner v. Stacy,* 45 Or App 483, 608 P2d 609 (1980). They argue that in those cases, and particularly in *Boese,* the agreed-upon terms were similar to those in this case. Plaintiffs are correct that the agreement in *Boese* included many terms similar to those in the memorandum agreement at issue here. However, *Boese* did not purport to be an exclusive and exhaustive determination of material terms in all land sale contracts; that is, depending on the circumstances of a particular transaction, other terms can be material, as they were here. The other cases relied on by plaintiffs are similarly distinguishable.

defendant's commercial property with his knowledge and at his request. ORS 87.010.[11] In the alternative, they argue that, even if defendant did not request the improvements, they are entitled to foreclose because, after defendant learned of the improvements, he did not timely post a notice denying responsibility and was, thus, deemed to have requested the improvements. ORS 87.030. Plaintiffs seek $3,096.68 for their improvements to defendant's barn.

The trial court found that defendant did not ask or authorize plaintiffs to repair his barn. Having reviewed the record, we agree. Thus, plaintiffs' first "actual request" argument fails.

■■ Plaintiffs' alternative "constructive request" argument fails because it is based on a misreading of the statute. ORS 87.030 provides:

> "Every improvement * * * *constructed upon lands with the knowledge of the owner* shall be deemed constructed at the instance of the owner, and the interest owned shall be subject to any lien perfected pursuant to the provisions of [the construction lien law], unless the owner shall, within three days after the owner *obtains knowledge of the construction*, give notice that the owner will not be responsible for the same by posting a notice in writing to that effect in some conspicuous place upon the land or the improvement situated thereon." (Emphasis supplied.)

Plaintiffs contend that "ORS 87.030 makes plain that construction work is necessarily done at the 'instance of the owner' if the owner fails to post written notice of his disapproval within three days of learning of the *improvement*." (Emphasis supplied.) That argument, however, disregards the plain language of ORS 87.030, which refers to the owner's knowledge of the "*construction*," not to knowledge of the "improvement." ORS 87.005(2) defines "construction" as

> "creation or making of an improvement, and alteration, partial construction and repairs done in and upon an improvement."

---

[11] ORS 87.010(1) provides:

"Any person performing labor upon, transporting or furnishing any material to be used in * * * the construction of any improvement shall have a lien upon the improvement for the labor, transportation or material furnished * * * at the instance of the owner of the improvement[.]"

ORS 87.005(5) defines "improvement" as

"any building, wharf, bridge, ditch, flume, reservoir, well, tunnel, fence, street, sidewalk, machinery, aqueduct and all other structures and superstructures, whenever it can be made applicable thereto."

Thus, "construction" for purposes of the lien statute refers to process, *i.e.*, the act of building. "Improvement" refers to product, *i.e.*, the structure. *Cf.* ORS 87.045(1) (providing that "[t]he completion of construction of an improvement shall occur when [*inter alia*] the improvement is substantially complete").

■     ORS 87.010(1) provides for the imposition of a lien only for "labor, transportation, or material furnished or equipment rented *at the instance* of the owner of the improvement or the construction agent of the owner." (Emphasis supplied.) Under ORS 87.030, an improvement cannot be deemed "constructed at the instance of the owner" unless it was "constructed upon lands with the knowledge of the owner." Consequently, no lien can arise under ORS 87.030 unless the improvement was built with the owner's actual or imputed knowledge. *See Williams v. Sharpe et al.*, 125 Or 379, 388, 265 P 793 (1928) (where defendants did not have actual knowledge of the work "being performed" by plaintiff because they resided elsewhere while the work was in progress, they were not required to post nonresponsibility notices to avoid lien liability).

■■     It follows, given the statute's text and context, that the "constructive request" provision is inapposite when an owner first becomes aware of an unsolicited improvement after it has been completed. In such instances, the improvement could not have been "constructed upon lands with the knowledge of the owner." Rather, the constructive request principle applies only when two conditions are satisfied: (1) an owner becomes aware that unauthorized construction is occurring on his or her property; and (2) the owner does not act to disclaim that construction by posting notice within three days thereafter. *See Tri-City Bldg. Center v. Wagner*, 274 Or 581, 589, 548 P2d 961 (1976) ("The statutory scheme assumes the construction was done at the direction of the Wagners since they had knowledge of the construction and did not post the notice of non-responsibility.").

We recognize that no Oregon decision has expressly addressed the application of the constructive request principle when the owner becomes aware of an improvement after construction has been completed, and that the discussions of constructive request under ORS 87.030 and its antecedents are sometimes inscrutable. *See, e.g., Dyer v. Thrift et al.*, 124 Or 249, 257, 264 P 428 (1928); *Falcon Holdings v. Isaacson*, 66 Or App 614, 619, 675 P2d 501 (1984). Still, our analysis accords not only with the text and context of the lien statutes, but with practical reality. A landowner who becomes aware that an unsolicited improvement is being built on his or her property should not be permitted to "lie in the weeds" during the course of the construction and then later claim the benefit, without cost, of the completed improvement. *See Dyer*, 124 Or at 258-59 (expressing estoppel rationale). *Accord* Brian A. Blum, *Mechanics' and Construction Liens in Alaska, Oregon and Washington*, § 3.4.7.b at 107 (1994) (constructive request principle applied where "the owner knew of the construction and failed to disabuse providers of work, material or supplies who might assume that the construction was being conducted on her behalf"). Conversely, no discernible purpose would be served by requiring a landowner to post a notice of disclaimer on a completed unsolicited improvement.[12] Indeed, after an improvement is built, the parties to whom notice is ostensibly directed — *i.e.*, those engaged in the construction — frequently have no occasion, much less right, to return to the building site.

■ Here, plaintiffs failed to prove that defendant knew that they were repairing his barn while that construction was occurring. Although it is undisputed that defendant noticed the barn repairs, including new siding, when he returned to

---

[12] In discussing whether, under a similar Alaska statute, an appellant could have affected the merits of his case by posting notices of nonresponsibility after having been served with copies of the summons and complaint, the Alaska Supreme Court observed:

" 'It surely never was the intention to make necessary the posting of such a notice by an owner to whom knowledge of the construction comes only after its completion. * * * It might happen that the first knowledge that the work claimed for was done might come to an owner through the service upon him of process for the enforcement of the lien. How absurd it would be to say in such a case that unless he, within three days after such service, posted the notice called for by the section, it must be held that the work was done at his request.' " *Vaara v. Ketchikan Spruce Mills*, 432 P2d 618, 622 n 20 (Alaska 1967) (quoting *Johnson v. Butler*, 7 Alberta LR 427, 22 DLR 347 (1915)).

the property in January 1991, it appears that those repairs had probably been completed before that time. In all events, plaintiffs did not establish that the construction was continuing as of January 1991. *See Gabriel Pow. & Sup. Co. v. Thompson*, 163 Or 623, 629, 97 P2d 182 (1939) (lien claimant has burden of showing owner's knowledge of construction). Consequently, the barn improvements were not subject to a construction lien under ORS 87.030, and the trial court properly denied foreclosure.

■ Plaintiffs' nurseryman's lien claim for expenses incurred in fencing, road work, and landscaping, as well as for related supplies, including lumber and plants, similarly fails. ORS 87.358 provides, in part:

> "A person who furnishes nursery stock of the value or agreed price of $25 or more, for planting on land, *at the request of the owner of that land, or with the knowledge or consent of the owner* has a lien on the land upon which the nursery stock is set out and planted for the reasonable or agreed charges for the nursery stock." (Emphasis supplied.)

Plaintiffs argue that, on *de novo* review, we should find that the nursery stock was planted with defendant's "knowledge or consent," despite the trial court's contrary finding. The trial court found:

> "Defendant authorized Plaintiffs to enter on the premises to cut firewood, in certain limited fashion for personal use, to use the property for recreation and to bring a swing set on to the property for Plaintiffs' children to use while Plaintiffs cut firewood. Defendant instructed Plaintiff to not engage in any other activity on the property. Plaintiffs failed to prove any alleged agreement by Defendant to authorize the improvement or nursery activities."

Our review of the record confirms the trial court's findings.

Affirmed.

**EDMONDS J.**, concurring.

I agree with the majority's analysis of the issue of plaintiffs' entitlement to judicial foreclosure of their construction and nurseryman's liens. However, I question the correctness of the majority's reasoning regarding plaintiffs' claim for specific performance, although I agree with its result.

The majority's analysis assumes that the parties had a "meeting of the minds," but that the agreement they entered into was too indefinite to be enforced because it lacked essential terms, *i.e.*, it did not address issues such as apportionment of property taxes, responsibility for deferred taxes in the event that the farm deferral was later lost, a septic tank permit, and easements. 134 Or App at 594. I do not agree with the majority's initial assumption that the parties reached an agreement for the sale of the property. Moreover, the terms that the majority says are too indefinite to be enforced were nonessential terms.

The applicable rule of law is that a court cannot make a contract for the parties by supplying essential or material terms, but it can fill in the gaps in a valid agreement with subordinate or nonessential terms. *Booras v. Uyeda*, 295 Or 181, 191-92, 666 P2d 791 (1983). Necessarily, what is an essential term will depend on the nature of the parties' agreement. The basic essential terms of an agreement to sell real property are:

> "(1) the parties; (2) the subject matter; (3) the mutual promises; and (4) the price and consideration and terms of payment if the sale is not for cash." Milton R. Friedman, *Contracts and Conveyances of Real Property* 95 (4th ed 1984).

Beyond those essentials, the particular circumstances of the property or the parties may make a term essential or non-essential. Responsibility for the apportionment of taxes, for taxes if the farm deferral is lost, for septic tank approval and for the obtaining of easements may or may not be material depending on the facts of each case.

Here, the parties signed a two-page handwritten document entitled "Memorandum" in September 1992, which identifies the parties to the memorandum, the description of the property, the price, terms of payment, and mutual promises concerning the care of livestock and the applications of logging proceeds from the property to the principle balance. In *Southworth v. Oliver*, 284 Or 361, 587 P2d 994 (1978), the court held an enclosure to a letter containing similar terms to be sufficiently definite and certain to be specifically enforceable. The court reasoned that the missing terms, on which the

defendants based their argument on appeal that the agreement was too indefinite to be enforceable, were not what prompted them to withdraw from the sale. *Id* at 380.

In this case, plaintiffs first became interested in purchasing the property in August 1990. As a result of that interest, plaintiff Keith Miller obtained information on the tax deferred status of the property, an easement of record that could furnish access to the property, and that a prior septic approval had occurred. Then, the parties met on September 2, 1990. At that time, they orally agreed to prorate the real property taxes on the closing date. The memorandum was signed some days later. Defendant agreed to extend the down payment due date until the property was surveyed and the 40 acres were partitioned from the 80 acres that defendant owned. Although the survey had not been completed at that time, defendant contacted plaintiffs in early June and requested the down payment. Plaintiffs refused, and at trial they testified that they refused because the partition was not complete.

From that point forward, the parties resorted to offers and counter-offers that varied the terms of the original memorandum. That evidence does not persuade me that the failure of the memorandum to specify responsibility for taxes and deferred taxes or to refer to septic tank permits or easements were terms considered by the parties to be essential to their agreement at the time that the memorandum was signed. There is no evidence that those terms were in dispute or material to either defendant or plaintiffs at the time the memorandum was signed. Rather, the effect of the missing terms relied on by the majority appears to have been raised by defendant after he saw his attorney and did not want to be bound by the memorandum. Because those other terms were not essential to the agreement at the time it was entered into, they cannot be the basis for denying specific performance.

Nonetheless, there is another reason why the majority's result is correct. Defendant argues that the memorandum relied on by plaintiffs as an enforceable agreement was intended to be nothing more than an agreement to negotiate a binding agreement at a later date. Therefore, it is not enforceable. *See Sunland Investment v. Bill Wolfe Ranches*, 46 Or App 145, 150, 610 P2d 1253 (1980) (holding that an earnest

money agreement was unenforceable because there was no meeting of the minds as to the essential terms of the contract and because the parties specifically provided in the agreement for the preparation and execution of a land sale contract). We review *de novo*, and there is persuasive evidence to support defendant's argument.

As the majority points out, the parties signed an earlier memorandum dated "Sept. 2, 1990," concerning the purchase of the same property for $42,000. It said, "The contract for sale of subject property will be negotiated at a later date between the parties. This is not an integrated contract." The parties orally agreed that the method of payment would be discussed at a later date as well as other matters and that a deed would be eventually placed into escrow.

Later, they met again, at which time the memorandum on which plaintiffs' claim is based was prepared. Defendant testified that he wanted to take the second memorandum to his attorney before he signed it, but was told by plaintiff Keith Miller,

> "[Y]ou don't need to, Ray. * * * This is just a memorandum of contract. We're just getting something together here that we can always change at any later date to fit so either one of us would be happy with it."[1]

The memorandum says, "Actual Contract to be typed and signed on delivery of $2,500 to Ray Odgen."

In June 1991, the parties' relationship broke down. Initially, neither took the position that the memorandum was a binding agreement. Defendant's attorney asserted the contrary to plaintiffs and tendered an earnest money agreement with different terms. In response, plaintiffs did not assert the enforceability of the memorandum. Rather, they rejected defendant's offer and counter-offered on terms that were also different from those in the memorandum. It was only when defendant did not accept plaintiffs' counter-offer that plaintiffs asserted the enforceability of the memorandum by seeking specific performance of its terms. All of this evidence

---

[1] According to the record, Keith Miller is a law school graduate. Defendant is a logger by occupation and has the equivalent of a high school diploma.

preponderates in favor of defendant's position that the parties never intended the memorandum to be a binding agreement. Consequently, plaintiffs have not carried their burden of persuasion that they entered into a binding agreement to which they are entitled to specific performance.

For this reason, I concur in the majority's result.