Argued and submitted September 27, 2000, reversed and remanded April 4, 2001

Daniel R. LANG,
*Appellant,*

*v.*

OREGON-IDAHO ANNUAL CONFERENCE
OF THE UNITED METHODIST CHURCH,
an Oregon non-profit organization,
*Respondent.*

OREGON-IDAHO ANNUAL CONFERENCE
OF THE UNITED METHODIST CHURCH,
an Oregon non-profit organization,
*Third-Party Plaintiff,*

*v.*

Joann HANSEN,
dba Joann Hansen Realty,
*Third-Party Defendant.*

(98CV-3387CC; CA A108524)

21 P3d 1116

Richard B. Brissenden II argued the cause for appellant. With him on the briefs was Daniel R. Lang.

Kim F. Melville argued the cause for respondent. With her on the brief were Paul S. Cosgrove and Lindsay, Hart, Neil & Weigler, LLP.

Before Kistler, Presiding Judge, and Deits,* Chief Judge, and Brewer,** Judge.

* Deits, C. J., *vice* De Muniz, P. J.

** Brewer, J., *vice* Warren, S. J.

KISTLER, P. J.

**KISTLER, P. J.**

Plaintiff filed this action seeking specific perform-ance of two alleged land-sale agreements. The trial court granted defendant's summary judgment motion and entered judgment in defendant's favor. On plaintiff's appeal, we reverse and remand.

Because this case arises on defendant's summary judgment motion, we state the facts in the light most favorable to plaintiff. *Olson v. F & D Publishing Co., Inc.*, 160 Or App 582, 584, 982 P2d 556 (1999). In 1997, defendant decided to offer property known as the Loon Lake Camp for sale. In September 4, 1997, defendant entered into a one-party list-ing agreement with a real estate agent, Joann Hansen, con-cerning the potential sale of that property to plaintiff. Plain-tiff made several offers for the property in September,[1] but defendant rejected them because the price was too low. In late September 1997, defendant made a counteroffer to sell plaintiff the property for $350,000 on October 15, 1997, if it had not received a higher offer by that date. On October 2, 1997, plaintiff sent defendant a "letter of intent to purchase," which stated:

"Buyer Daniel R. Lang intends to purchase the above referred to property for the sum of THREE HUNDRED FIFTY THOUSAND AND NO/100 ($350,000) DOLLARS CASH at closing with Seller to set the terms of sale accept-able to the Buyer. Standard Earnest Money Agreement to be executed by Seller and Buyer as soon as possible after consent of Seller. Standard Earnest Money Agreement shall include but not be limited to provisions regarding sharing the cost of closing escrow equally. Closing date to be 30 days following execution of the Earnest Money Agree-ment. Seller to provide Buyer, at Seller's expense, a title insurance policy in the amount of the purchase price of the real estate showing good and marketable title. Prior to clos-ing this transaction, the Seller shall furnish to the Buyer a preliminary title report made by a title insurance company showing the condition of the property title, acceptable to Buyer, prorations of taxes and insurance; and an inventory

---

[1] Plaintiff presented its offers on preprinted earnest money agreement forms.

of all personal property located on the premises or related to the property.

"Buyer is relying upon Seller's representation regarding timber volume according to the reported written timber cruise on the subject property.

"This letter shall automatically expire at 1:30 p.m., October 3, 1997, unless written confirmation of consent/ agreement is received via fax by Joann Hansen Realty (Fax No. 541-267-0498) and Daniel R. Lang (Fax No. 541-459-1230 or 541-673-5567)."

The letter provided a signature line that was captioned "Seller's Consent and Agreement to be bound." Defendant did not sign the letter, nor did it fax written confirmation to plaintiff or Hansen.

Defendant's Board of Trustees met on October 3, 1997, and considered plaintiff's letter. The Board's minutes state:

"Bob Ledden *moved* that the Board of Trustees accept Daniel Lang's attempt to buy and authorize a lawyer to draw up a contract with a selling price of $350,000 for the Loon Lake property. The motion was seconded. Then Pam [Meese] *moved* that the motion be amended to include the stipulation 'if no better offer is received by November 3, 1997.' The amendment was seconded and CARRIED. The amended main motion was then CARRIED.

"It was agreed upon that we needed a vehicle to communicate our desire for bids and the newly adopted deadline. John [Wittmayer] volunteered to call Danny Lang and our attorney [Paul] Cosgrove, to inform them of our decisions. David appointed John to act in this capacity.

"* * * * *

"* * * It was pointed out that the likelihood of a bid substantially more than $350,000 in the next 30 days from such a notification [of local realtors] was slim. On the other hand, after November 3rd, we would either be committed to selling to Danny Lang, have an even greater bid in process, or have ample time to notify realtors of our desire to sell.

"* * * * *

"John reported that Danny Lang seemed happy with our proposal, when he called him."

(Emphasis and capitalization in original.)

According to plaintiff, Wittmayer called him on October 3, 1997, and told him that the Board had "voted a [r]esolution to accept [his] $350,000 full price offer for the Loon Lake Camp Property subject to a condition that [defendant] be allowed to receive and accept any higher offers made before November 3, 1997 and that [defendant] would have its attorney prepare a contract for [plaintiff's] purchase." According to plaintiff, he "accept[ed] the one condition that while [his] offer had been accepted, [defendant] reserved the right to accep[t] any higher offer that might be received prior to November 3, 1997."

On November 3, 1997, defendant's attorney sent a draft purchase-and-sale agreement to plaintiff. The draft agreement contained several terms that went beyond the terms of the standard earnest money agreement to which plaintiff had referred in his letter of intent. Plaintiff objected to one term, a release clause that would have relieved defendant of liability for any noncompliance with environmental laws. Plaintiff deleted that clause and signed the agreement. Defendant, however, did not agree to the clause's deletion. The parties attempted to negotiate their differences throughout early 1998 but were unable to agree.

On May 13, 1998, defendant's attorney sent a draft agreement to Hansen stating that it "is probably the final" agreement from defendant's perspective. The letter also stated that if plaintiff "is still interested in purchasing the property, please have him sign and return the enclosed Agreement * * * on or before close of business on May 29, 1998." Plaintiff did not accept defendant's offer.

On October 6, 1998, plaintiff, Hansen, and Wittmayer met in Portland to discuss, once again, the sale of the property. According to Hansen, Wittmayer said that the property was still available to plaintiff at $350,000 on the same terms and conditions that defendant had presented in May. According to Wittmayer, he told plaintiff and Hansen that, only for purposes of their discussion, they could assume

the property was still available to plaintiff on the final terms that defendant had offered in May.

On October 9, 1998, plaintiff told Hansen that he would buy the property on defendant's terms, and Hansen communicated that message to defendant. On October 11, 1998, Wittmayer called Hansen and told her that defendant had a higher offer on the property and was no longer willing to sell the property to plaintiff for $350,000.

Plaintiff filed this action for specific performance. His complaint alleges four claims for relief. The first three claims for relief focus on the agreement that was allegedly formed on October 3, 1997.[2] Plaintiff's fourth claim for relief alleges that on October 6, 1998, defendant offered to sell him the property on the same terms that defendant had set out in its May 13, 1998, offer and that plaintiff accepted those terms on October 9, 1998. Defendant filed an answer in which it denied plaintiff's allegations, raised some affirmative defenses, but did not raise the statute of frauds as an affirmative defense. Defendant later filed a motion for summary judgment that raised, among other things, the statute of frauds. Plaintiff responded that defendant had waived its right to raise the statute but that, in any event, the statute was satisfied.

The trial court granted defendant's summary judgment motion. The court stated that, taking the facts in the light most favorable to plaintiff, no contract was formed in October 1997. The court also ruled that defendant was entitled to raise the statute of frauds as a defense. The court apparently found that no contract was formed in October 1998 or that any contract that was formed in 1998 did not satisfy the statute of frauds. On appeal, plaintiff argues that the evidence was sufficient to permit a reasonable trier of fact to find that the parties entered into two enforceable contracts and that both were memorialized in a writing. Defendant responds that no reasonable trier of fact could find that the

---

[2] Characterizing the October 3, 1997, agreement as both written and oral, plaintiff claims that defendant breached a written contract, that defendant breached an oral agreement that plaintiff had partly performed, and that defendant breached an oral agreement on which plaintiff had detrimentally relied.

parties entered into an enforceable contract in either October 1997 or October 1998. Defendant argues alternatively that the alleged October 1998 agreement does not satisfy the statute of frauds.

We begin with defendant's argument that the parties never reached an enforceable agreement in October 1997. Plaintiff appears to argue that his October 2, 1997, letter of intent can be construed as an acceptance of defendant's late September offer to sell him the property for $350,000. Acceptance of an offer must be "positive, unconditional, unequivocal and unambiguous, and must not change, add to, or qualify the terms of the offer." *Wagner v. Rainier Mfg. Co.*, 230 Or 531, 538, 371 P2d 74 (1962) (citation omitted). Plaintiff's October 2 letter does not meet that standard. It does not accept one of the terms of defendant's September offer—that defendant had until October 15 to receive higher offers. Because the letter of intent did not embody the same terms as the earlier offer, it was not an acceptance. It was instead a counteroffer.

Plaintiff next argues that, if his October 2 letter of intent was a counteroffer, the Board accepted it. The letter of intent, however, set out a specific method of acceptance; it required "written confirmation of consent/agreement * * * via fax" to plaintiff and Hansen by 1:30 p.m. on October 3, 1997. "It is a fundamental rule of contract law that the provisions of an offer as to the place and manner of acceptance must be complied with." *Pacific Photocopy, Inc. v. Canon U.S.A., Inc.*, 57 Or App 752, 757, 646 P2d 647, *rev den* 293 Or 635 (1982). Defendant did not respond according to the terms of plaintiff's October 2 counteroffer. Moreover, defendant proposed additional terms. According to plaintiff's affidavit, defendant "accept[ed]" plaintiff's offer "subject to a condition that [defendant] be allowed to receive and accept any higher offers made before November 3, 1997[.]" Defendant's response to plaintiff's October 2, 1997, letter of intent was not an acceptance but another counteroffer.

If, however, we construe the facts in the light most favorable to plaintiff, plaintiff accepted defendant's counteroffer on October 3 during Wittmayer's call to plaintiff. Given

plaintiff's affidavit, a reasonable trier of fact could find that plaintiff accepted the additional condition or conditions[3] that defendant proposed and that the parties' agreement consisted of the terms set out in plaintiff's letter of intent, as modified by the conditions stated during the telephone call.[4]

Defendant, however, advances two related but separate arguments why no enforceable contract was formed. It argues that the parties did not intend to be bound until their agreement was reduced to writing. Alternatively, it argues that, even if an agreement were formed, the agreement was not specifically enforceable because it was not definite in all material respects. Defendant reasons that the agreement was nothing more than an agreement to agree. It cites the fact that plaintiff's letter of intent says "[s]eller to set the terms of sale acceptable to the Buyer" and the fact that defendant's attorney was to prepare the sale contract as evidence that not all material terms had been agreed on when plaintiff accepted defendant's counteroffer. We address defendant's second argument first.

 The Supreme Court has explained that "[t]o be entitled to specific performance, a contract must be definite in all material respects, with nothing left for future negotiation." *Booras v. Uyeda*, 295 Or 181, 191, 666 P2d 791 (1983). It has also recognized, however, that "[t]he foregoing proposition is subject to an exception that * * * [i]f there is sufficient intent expressed to make a legally valid contract, a court of equity can make certain by its decree, within limits, subordinate

---

[3] Defendant appears to take the position that its counteroffer on October 3, 1997, was subject to two conditions: (1) that defendant would be able to accept any higher offer it received before November 3, 1997, and (2) that its attorney would prepare a contract of sale. Plaintiff assumes that the counteroffer was subject only to the condition that the offer remain open until November 3. He appears to interpret the statement that defendant's attorney would prepare a contract of sale as simply designating who would be responsible for memorializing the parties' binding agreement. *See Wagner*, 230 Or at 539-40. Plaintiff's recitation of defendant's acceptance is susceptible to either interpretation. The question of which interpretation the parties intended presents a factual issue. *See id.*

[4] Defendant argues that it "did not resolve, approve, or agree to any terms in [p]laintiff's Letter of Intent other than the purchase price." However, according to plaintiff's affidavit, Wittmayer "communicated to [plaintiff] that 'the Board of Trustees voted a [r]esolution to accept your $350,000 full price *offer*.'" (Emphasis added.) A reasonable trier of fact could find that defendant had accepted the whole offer, not merely the purchase price.

details of performance which the contract itself does not state.' " *Id.* at 191-92 (ellipses in original). We accordingly have held that an earnest money agreement that does not resolve all the essential terms of the contract may not be specifically enforced. *Miller v. Ogden*, 134 Or App 589, 594-95, 896 P2d 596 (1995), *aff'd* 325 Or 248 (1997); *Sunland Investment v. Bill Wolfe Ranches*, 46 Or App 145, 610 P2d 1253 (1980). Conversely, an earnest money agreement that leaves only "minor details" to future agreement is sufficiently definite to be specifically enforceable. *Stone-Fox, Inc. v. Vandehey Development Co.*, 46 Or App 465, 611 P2d 1195 (1980), *reversed on other grounds* 290 Or 779, 626 P2d 1365 (1981); *accord Booras*, 295 Or at 191-92 (recognizing that subordinate details need not be spelled out for an agreement to be specifically enforceable).

 "In every agreement for the sale of land, the essential terms include the designation of the parties, the identification of the property, the promise to sell and buy, the purchase price and how it will be paid, and a fixed time and place for the delivery of the deed or 'closing.' " *Povey v. Clow*, 146 Or App 760, 764, 934 P2d 528 (1997). Whether additional terms are material will vary depending on the "particular circumstances of the property or the parties." *Id.*; *see also Olson*, 160 Or App at 589-90. In this case, defendant does not argue that plaintiff's letter of intent does not specify all the essential terms of a land-sale contract. Rather, defendant argues that the parties left other material terms to be decided. Whether the parties understood that the remaining terms were "subordinate details of performance" that would not prevent their agreement from being specifically enforced or were instead material terms will depend on the "particular circumstances of the property or the parties." *Povey*, 146 Or App at 764.

 In resolving that issue, we note that this case differs in one significant respect from the cases on which plaintiff relies. Those cases—*Miller, Sunderland, Booras,* and *Povey*—all arose after a trial on the merits. The question in those cases was what the parties in fact intended. This case arises on summary judgment, and the question here is whether a trier of fact could reasonably infer that the parties

had agreed on all the material terms of the land-sale agreement and left only minor or subordinate details to future resolution. The reference in plaintiff's letter of intent to entering into a standard earnest money agreement would permit a reasonable trier of fact to draw that inference. More specifically, a reasonable trier of fact could find that defendant breached the agreement when it later sought to add a material term—the clause on environmental liability—not found in the standard earnest money agreement.

■ Our resolution of defendant's argument that the agreement is not sufficiently definite to be enforceable also resolves defendant's argument the parties did not intend to be bound until their agreement was reduced to writing. The court set out the controlling legal principles in *Wagner*:

> " 'Normally the fact that parties contemplate the execution of a final written agreement justifies a strong inference that the parties do not intend to be bound by earlier negotiations or agreements until the final terms are settled. * * * Said fact does not conclusively establish such intention. * * * If all the material terms which are to be incorporated into a future writing have been agreed upon, it may be inferred that the writing to be drafted and delivered is a mere memorial of the contract, which is already final by the earlier mutual assent of the parties to those terms.' "

*Wagner*, 230 Or at 540 (quoting *Rosenfeld v. United States Trust Co.*, 290 Mass 210, 216, 195 NE 323 (1935)); *see also Cook v. Desler*, 52 Or App 5, 11-12, 627 P2d 885, *rev den* 291 Or 368 (1981). Because, as explained above, a trier of fact could find that the parties had agreed on all material terms, it also could find that the parties intended that the future writing would merely memorialize their binding agreement. The evidence of course permits the contrary inference, but that fact provides no basis for granting defendant's summary judgment motion. Defendant was not entitled to summary judgment on the theory that no enforceable agreement was reached in October 1997.[5]

---

[5] In his opening brief, plaintiff argues that defendant waived its right to assert the statute of frauds as a defense. Plaintiff also argues that the minutes of the Board's October 3, 1997, meeting are a sufficient memorandum to satisfy the statute of frauds. Defendant's response to that argument is limited. It argues that it did not waive a statute of frauds defense by waiting until it filed its summary

■ Plaintiff also argues that he entered into a second agreement with defendant to purchase the Loon Lake property. In May 1998, defendant's attorney prepared a draft land-sale agreement and tendered it to plaintiff with instructions that it was to be signed and returned to the attorney by May 29, 1998. Plaintiff did not sign the contract by that date. On October 6, 1998, however, plaintiff, Wittmayer, and Hansen renewed their discussion about the sale of the land. According to plaintiff,

> "[Wittmayer told him during the meeting that the Loon Lake] property was still for sale and the only way [defendant] is going to sell you the [p]roperty is upon the same terms and conditions as recommended by our attorney, last May, when negotiations broke down."

Plaintiff called Hansen on October 9 accepting the terms and conditions that defendant had set out in May, and Hansen communicated plaintiff's message to defendant. A reasonable trier of fact could infer from plaintiff's version of the facts that defendant renewed its May 1998 offer to sell the Loon Lake property to plaintiff and that plaintiff accepted the offer.

Defendant, however, argues that the October 1998 agreement is barred by the statute of frauds. *See* ORS 41.580.[6] Defendant reasons:

> "Plaintiff relies on Cosgrove's May 13, 1998 'final offer' letter as evidence [that defendant] agreed to be bound to [p]laintiff's October 1998 offer. However, as explained above, [defendant's] May 1998 offer expired on May 29, 1998 and was never renewed. Plaintiff cannot then rely on

judgment motion to raise the issue, but it never explains in its responsive brief why the minutes of the October 3, 1997, Board meeting do not satisfy the statute of frauds. Rather, it limits its argument on the October 3, 1997, agreement to the theory that no enforceable agreement was ever formed. We accordingly limit our discussion of the October 1997 agreement to the question of contract formation and do not address whether the Board's minutes satisfy the statute of frauds. *See State v. Maxwell*, 165 Or App 467, 472 n 5, 998 P2d 680 (2000) (declining to address an issue that had not been adequately briefed).

[6] ORS 41.580(1)(e) provides that an agreement for the sale of real property "is void unless it, or some note or memorandum thereof, expressing the consideration, is in writing and subscribed by the party to be charged, or by the lawfully authorized agent of the party[.]"

the May 1998 offer as a writing evidencing a later agreement when there is no evidence [that defendant] agreed to those terms again in October 1998."

Defendant's statute of frauds argument appears to turn on one of two theories. Defendant appears to take the position that its written offer in May 1998 cannot serve as a "note or memorandum" of the October 1998 agreement because defendant never renewed the May offer. That argument simply restates defendant's contract formation argument. As explained above, a reasonable trier of fact could find that defendant did renew its May offer in October.

 Alternatively, defendant may take the position that, even if the May 1998 offer were renewed in October, a writing that is created before the agreement is formed cannot satisfy the statute of frauds. That position is inconsistent with settled authority. A writing need not be contemporaneous with the agreement to satisfy the statute of frauds. *See D'Angelo v. Schultz*, 110 Or App 445, 449-50, 823 P2d 997, *rev den* 313 Or 209 (1992). As Corbin explains:

"Sometimes * * * A prepares and signs [a written draft] and sends it to B as an offer, without requiring that B shall accept by signing it. In such a case, B has power to accept and to close the deal by an oral communication, or by a separate writing, signed or unsigned. The written and signed offer of A is a sufficient memorandum of the contract making it enforceable against A, when he is the party to be charged in an action subsequently brought. This is the law, even though the writing was signed before any contract came into existence, and even though it has no probative value in proving that B ever accepted."

Arthur Linton Corbin, 2 *Corbin on Contracts* § 503, 711-12 (1950). We agree with that analysis. If, as plaintiff claims, defendant renewed the May 1998 offer and plaintiff accepted that renewed offer, the May draft agreement provides a sufficient memorandum to satisfy the statute of frauds.[7]

A trier of fact reasonably could find that defendant entered into an enforceable agreement in October 1997 and

---

[7] Defendant does not argue that the May 1998 letter and accompanying draft agreement do not satisfy the statute of frauds because they do not comply with the subscription requirement. We accordingly do not address that issue.

another enforceable agreement in October 1998 to sell the Loon Lake property to plaintiff. Defendant was not entitled to summary judgment on either alleged agreement.

Reversed and remanded.